Chester O. WANVIG, Jr. and Martha
I. Wanvig, Plaintiffs,

v.

**UNITED STATES of America,
Defendants.**

**No. 67–C–177.**

United States District Court
E. D. Wisconsin.

Jan. 23, 1969.

Steven E. Keane, Foley, Sammond & Lardner, Milwaukee, Wis., for plaintiffs.

James B. Brennan, U. S. Atty., Milwaukee, Wis., for defendants.

## DECISION

MYRON L. GORDON, District Judge.

The plaintiffs, Chester O. Wanvig, Jr. and his wife, Martha I. Wanvig, instituted this action to recover taxes and interest paid. In this opinion, Mr. Wanvig may at times be referred to as the "taxpayer" or as the "plaintiff". Jurisdiction is founded upon 28 U.S.C. § 1346(a) (1).

The parties have thoroughly briefed their positions. Without trial, and based upon such briefs, the case has now been submitted for disposition. The facts recited hereinafter have been established by stipulation.

In February, 1955, taxpayer deposited $12,067.84 with the New York Life Insurance Company to pay premiums on his life insurance policies with that company for the period February 21, 1956 to February 21, 1958, and $4,296.17 with the John Hancock Mutual Life Insurance Company to pay premiums on his life insurance policies with that company for the period February 23, 1956 to February 23, 1958.

In February, 1959, taxpayer deposited $18,242.66 with New York Life to pay premiums on his life insurance policies with that company for the period February 21, 1959 to February 21, 1962, and $4,265.19 with John Hancock to pay premiums on his life insurance policies with that company for the period February 23, 1960 to February 23, 1962. During February, 1962, taxpayer deposited $28,995.38 with New York Life to pay premiums for the period February 21, 1962 to February 21, 1967, and $8,091.05 with John Hancock to pay premiums on his policies with that company for the period February 23, 1963 to February 23, 1967.

The taxpayer borrowed money from the First Wisconsin National Bank of Milwaukee to make these deposits. The loans were secured by a pledge of the insurance policies listed above, other insurance policies, and, from time to time, varying amounts of marketable securities.

Mr. Wanvig paid interest to the First Wisconsin National Bank on the portion of his loans attributable to the payment of life insurance premiums in 1961 of

$3,527.52; in 1962 of $5,795.00; and in 1963 of $5,795.00.

On July 5, 1951, taxpayer was 31 years of age and had a life expectancy of 40 years.

On November 3, 1958, the taxpayer was granted options by his employer, Globe Union, Inc., for the purchase of 5,500 shares of Globe Union common at $9.80 a share, which was the stock's closing price on the American Stock Exchange on that date. On November 22, 1960, the taxpayer was granted options to purchase 6,000 shares of Globe Union common stock at $14.44 a share, which was the stock's closing price on the American Stock Exchange on that date.

Both of these options were granted to the taxpayer as compensation for his services as an employee.

These options were restricted stock options as that term is now defined in 26 U.S.C. § 424 provided that the taxpayer did not own 10% of the total combined voting power of all classes of stock of Globe Union, Inc. under the applicable attribution rules. Further, taxpayer may not be treated as owning over 10% of the combined voting power of Globe Union stock unless the shares owned by his adoptive father or adoptive sister are attributed to him.

On May 17, 1961, options granted in 1958 for 2,700 shares were exercised. On November 23, 1962, 900 shares of the option granted in 1958 were exercised. On March 7, 1962, 900 shares of the 1958 options and 1,200 shares of the options granted in 1960 were exercised. The closing price for Globe Union common stock on the New York Stock Exchange was $22.34 on May 17, 1961; $20.50 on November 23, 1962; and $22.18 on March 7, 1962.

Jean Wanvig and Chester Wanvig, Jr. were both adopted by Chester Wanvig, Sr., and were not related prior to their adoptions.

In the complaint, the taxpayer alleges that on his income tax returns for the years 1961, 1962, and 1963, he deducted the interest paid the First Wisconsin National Bank of Milwaukee during those years. Following an audit in 1965, the Internal Revenue Service asserted that the interest attributable to loans used to prepay insurance was not deductible.

The taxing authority also included in taxpayer's income $33,858 for 1961 and $30,060 for 1962. These amounts represent the difference between the fair market value of the options on the date of exercise and the option price of the options exercised in 1961 and 1962.

On or about July 8, 1966, the taxpayer paid $930.00 additional tax for 1961; $1,156.44 additional tax for 1962; and $779.45 additional tax for 1963. On September 16, 1966, the taxpayer paid an additional $25,000.00 tax for the year 1961; $23,000.00 additional tax for 1962; and $2,000.00 for 1963. On or about November 23, 1966, taxpayer paid an additional tax of $352.61 for 1961; $438.-53 for 1962; and $1,633.60 for 1963. These payments were made pursuant to the procedure which reserved to plaintiff the right to file a claim for refund.

Claims for refund in the amount of $51,234.79 were filed in 1967. On April 28, 1967, these claims were disallowed, and the taxpayer instituted this action.

The issues before the court are:

(1) Was the interest on taxpayer's indebtedness properly deductible under 26 U.S.C. § 163?

(2) Did the stock options granted to taxpayer qualify as restricted stock options under 26 U.S.C. § 421 as it stood in 1961 (now 26 U.S.C. §§ 424, 425)?

(3) If the answer to question (2) above is "No", should the options be taxed at the time of grant or at the time of exercise?

## I. THE INTEREST DEDUCTIONS

This issue revolves around whether taxpayer's interest payments on the money borrowed to prepay life insurance premiums fall within 26 U.S.C. § 163, which states the general rule that

"There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness"

or whether these transactions are within the purview of 26 U.S.C. § 264. This latter section states that

"(a) General rule—No deduction shall be allowed for—

＊ ＊ ＊ ＊ ＊ ＊

(2) Any amount paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance, endowment, or annuity contract.

＊ ＊ ＊ ＊ ＊ ＊

"(b) For purposes of subsection (a) (2), a contract shall be treated as a single premium contract—

(1) if substantially all the premiums on the contract are paid within a period of 4 years from the date on which the contract is purchased, or

(2) if an amount is deposited after March 1, 1954, with the insurer for payment of a *substantial number of future premiums on the contract.*"

The answer hinges on whether an amount was deposited "with the insurer for payment of a substantial number of future premiums on the contract." The parties agree that 26 U.S.C. § 264(b) (1) is inapplicable. See Dudderar v. Commissioner, 44 T.C. 632 (1965), where it was held that payment in the first four years of the contract of 73% of all the premiums was not "substantially all" the premiums within that subsection. It is further agreed that the loan transactions were bona fide business transactions and thus not within the scope of Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).

In my opinion, these interest payments were properly deductible under 26 U.S.C. § 163.

We are dealing here with prepayments of never more than 4 annual premiums by a taxpayer who in 1961 was 41 years of age and presumably had a life expectancy of about 30 years. Whether a prepayment of 4 premiums is considered in the abstract, or whether it is measured against the potential number of future premiums, in neither case is it a "substantial number of future premiums" within the meaning of section 264.

In Campbell v. Cen-Tex, Inc., 377 F.2d 688 (5th Cir. 1967), the court of appeals for the fifth circuit affirmed a trial court decision holding that a prepayment of four years' premiums was not a substantial number of future premiums. The court compared the four years' prepayment to the estimated number of future premiums (in that case the court was concerned with 4 people whose life expectancies were, respectively, 38, 34, 32 and 14 years).

Since Mr. Wanvig's life expectancy in 1961 was approximately 30 years, this situation is quite similar to that in the *Campbell* Case.

The United States, however, cites Goldman v. United States, 273 F.Supp. 137, (W.D.Okl.1967) decided subsequent to *Campbell.* It is true that in the *Goldman* Case the court found that a prepayment of 4 premiums was a substantial number of future premiums, but no reasoning is given to support that conclusion. The reported decision in the *Goldman* Case consists of the court's findings of fact and conclusions of law. In addition, since the court had already determined that the underlying transactions were not bona fide, the determination under section 264(b) (2) was not crucial. In any event, this court is of the opinion that the *Campbell* Case correctly states the law.

The deductions for interest paid on money borrowed to prepay insurance premiums in 1961, 1962, and 1963 should have been permitted under 26 U.S.C. § 163.

## II. WERE THESE RESTRICTED STOCK OPTIONS UNDER 26 U.S.C. § 421 AS IT STOOD IN 1961?

The parties have stipulated that the stock options in question were restricted stock options within the meaning of 26 U.S.C. § 421 (as it stood in 1961), *unless* the stockholdings of either taxpayer's

adoptive sister or adoptive father are attributable to him under 26 U.S.C. § 421(d) (1) (C) (i). (That attribution section is now 26 U.S.C. § 425(d)). All the references hereinafter to statutory sections are to those existing in 1961.

If either attribution is made, the result would be to increase the taxpayer's holdings in Globe Union to over 10% of the combined voting power of all classes of stock. Such holdings would disqualify the options from the favorable tax treatment accorded restricted stock options.

26 U.S.C. § 421(d) (1) (C) (i) stated that

"Such individual shall be considered as owning the stock owned, directly or indirectly, by or for his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; and * * *."

While this section states that a taxpayer is to be considered to own stock owned by his sisters (whether by the whole or half blood) and by his ancestors, no direct mention is made of an *adoptive* sister or father. Does this section include or exclude such persons? The problem before this court is to determine the intent of the legislature on this question; apparently there are no case rulings or regulations on point.

The purpose behind this section is reasonably clear. The legislature wanted to deny favorable tax treatment of stock options to anyone who owned, directly or indirectly, 10% of the stock in the company in question. A person who owned this percentage should not be called an employee. To that end, the legislators attributed stock owned by the optionee's family to him; evidently the assumption is that if his family owns stock in the company, it enures to his benefit. See S.Rep. No. 2375, 81st Cong., 2d Sess., pp. 59–60 (1950–2 Cum.Bull. 483, 526–527).

The statutory language is broad; the use of the alternative word "or" on two occasions illustrates this. Further, the legislature was obviously concerned with indirect ownership; the classes of persons whose stock is to be attributed to the taxpayer are also broad, including brothers, sisters, spouse, ancestors and lineal descendants. The last two classes are especially wide in scope.

These factors tend to support the conclusion that the legislature had in mind a very extensive scope for this section, and that it intended to include stock held by an adoptive father and an adoptive sister within the prohibition, even though such people are not specifically mentioned.

There is, however, a worthy counter argument. It is to be noted that, except for the attribution between spouses, the other classes speak in terms of a blood relationship. Congress explicitly spoke of brothers and sisters *whether by the whole or half blood.* The use of the word "whether" in this context is also noteworthy because it implies an alternative and might be deemed to exclude persons not in one of the two listed categories. The case for the inclusion of adopted brothers and sisters in this category is weakened by the fact that Congress chose to speak directly to the problem of which brothers and sisters were to be included, and in so doing they make no mention of the adopted brother and sister. The categories "ancestors" and "lineal descendants" are also often thought to connote a blood relationship, although this is not always true. For instance, Wisconsin now holds that an adopted child is a "lineal descendant". See Estate of Nelson, 266 Wis. 617, 64 N.W.2d 406 (1954). For conflicting views on the definition of "lineal descendant" within estate tax statutes see the annotation at 51 A.L.R.2d 854.

It is arguable that Congress is aware of the potential problems caused by adoption as demonstrated by other sections of the Code which specifically refer to adoptions. For example, see 26 U.S.C. § 318, dealing with definitions in regard to corporate distributions and liquidations.

It may even be urged that Congress realizes that adopted persons are not blood relatives unless made so by legislation. The taxing authority counters

with the argument that adopted children should be held to be within the scope of the statute because under Wisconsin law an adopted child is considered for all purposes to be a natural child. See Wis. Stat. § 48.92 (1965). As noted above, the effect of this statute has even been to make an adopted child a "lineal descend-ant" of his adoptive parents. See Estate of Nelson, supra. However, this was done through legislative action; there is no federal statute having the same ef-fect. Further, this is not a persuasive reason for including adopted children within this statute. Wisconsin's treat-ment of adoptive children cannot con-trol the federal tax laws; indeed, there is a need for uniformity in this field which would be lost if the court were to base its decision on the laws of a state. See Morgan v. Commissioner of Internal Revenue, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940).

■ After much consideration of the opposing positions, it is my conclusion that Congress intended to include adopt-ed persons within the reaches of section 421(d) (1) (C) (i). Therefore, the shares owned by Mr. Wanvig's sister and father are attributed to him; and his options cannot qualify as restricted stock options. To hold otherwise would frus-trate the congressional purpose as ex-pressed by its history and scope, i. e. to attribute to a stockholder all stock held by those in a close family relationship to him.

## III. SHOULD THESE STOCK OP-TIONS BE TAXED AT THE TIME OF GRANT OR THE TIME OF EXERCISE?

Employee stock options that do not qualify as restricted stock options pur-suant to section 421 are taxed under the rules set forth in section 1.421–6 of the Treasury Regulations. Section 1.421–6 provides in relevant part that if a non-restricted stock option has a "readily as-certainable fair market value" at the time it is granted, the employee who re-ceives the option realizes compensation at the time of the grant in an amount equal to the excess, if any, of the fair market value over the amount paid for the option. Where there is no "readily ascertainable fair market value" at the time of grant, taxation is delayed until the exercise or transfer of the options. Realizing that these regulations clear-ly apply to these options, the plaintiff's only argument is that the regulations are erroneous and should be stricken. His contention is that the only reason the Internal Revenue Service refuses to tax these options at the time of the grant is because of the "substantial tax windfall it receives" by the later taxation.

■ Section 1.421–6 of the regula-tions attempts to codify two cases de-cided by the U. S. Supreme Court: Com-missioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830 (1945) and Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956). Regardless of the validity or invalidity of the regu-lation, the factual situation in the pres-ent case is clearly governed by these two cases. *Smith* and *LoBue* make it clear that the options in the case at bar are to be taxed at the time of exercise and not at the time of grant. Mr. Wanvig's options had the following features: the option price was equal to the fair market value of the stock on the date of grant; the options were not traded on an estab-lished market; they were not exercisa-ble immediately in full by the optionee; they were subject to the restriction that Mr. Wanvig remain in the employ of Globe Union; and they were not freely transferable by him.

In the *Smith* Case an employee was given an option to buy stock in a com-pany which the employer was going to acquire. The option price at the date of grant was not less than the then fair market value of the stock. The U. S. Su-preme Court taxed the options at the date of exercise, not the date of grant. The court stated as follows at pp. 181–182 of 324 U.S., at p. 593 of 65 S.Ct.:

"When the option price is less than the market price of the property for the purchase of which the option is given,

888

it may have present value and may be found to be itself compensation for services rendered. But it is plain that in circumstances of the present case, the option when given did not operate to transfer any of the shares of stock from the employer to the employee * * *. And as the option was not found to have any market value when given, it could not itself operate to compensate respondent. It could do so only as it might be the means of securing the transfer of the shares of stock from the employer to the employee at a price less than the market value, or possibly, which we do not decide, as the option might be sold when that disparity in value existed. Hence the compensation for respondent's services, which the parties contemplated, plainly was not confined to the mere delivery to respondent of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose. It of course does not follow that in other circumstances not here present the option itself, rather than the proceeds of its exercise, could not be found to be the only intended compensation."

This statement was refined in *LoBue*. The court there dealt with untransferrable stock options contingent upon continued employment. In finding that these options should not be taxed until they were exercised, the court stated at p. 249 of 351 U.S., at p. 804 of 76 S.Ct.:

"It is of course possible for the recipient of a stock option to realize an immediate taxable gain. [citing *Smith*]. The option might have a *readily ascertainable market value* and the recipient might be free to sell his option. But this is not such a case. These three options were not transferable and LoBue's right to buy stock under them was contingent upon his remaining an employee * * * until they were exercised." (emphasis added)

The test, then, as established by *LoBue* is whether these options had a

readily ascertainable market value on the date of grant. If not, the options are to be taxed at the date of exercise and not at the date of grant.

As in *Smith*, the price of these options was equal to the fair market value of the stock on the date of grant, and, as in *LoBue*, the transferability of the options was severely restricted, and they were contingent upon continued employment.

The difficulty of establishing a readily ascertainable market value was discussed in Union Chemical and Materials Corp. v. United States, 296 F.2d 221, 155 Ct.Cl. 540 (1961). The court there dealt with options costing more than the fair market value of the stock on the date of grant. They were later exercised at a time when the market value of the stock had risen. The tax court found that the options had a value of "at least" $6,000, and two brokers testified that they were worth "around" $30,000 to $35,000. The court of claims reversed, saying, at p. 225:

"Is this what is meant by a readily ascertainable market value? * * * Certainly it was worth something, but exactly how much no one could ascertain. Therefore, the stock options did not have a readily ascertainable market value, and under the rule in *LoBue*, supra, the value should be measured as of the time the options were exercised and not at the time they were granted."

The seventh circuit recently dealt with this subject in LeVant v. Commissioner of Internal Revenue, 376 F.2d 434 (7th Cir. 1967), a case in which three opinions were filed. Mr. LeVant, incidentally, made the same challenge to the regulations in that case that Mr. Wanvig does in this. In *LeVant*, the plaintiff had been offered a two-year option to purchase up to 20% of the S. M. Edison Chemical Company at a cost of $50,000. The offer was conditional, however, on certain fiscal happenings; because the said conditions were not fulfilled, the opinion of the court, written by Judge Major, states that no option was ever

given. Judge Major went on, however, to assert that if the petitioner *had* received on option, it was personal and not assignable (as in our case) and therefore could have no fair market value. Since Mr. LeVant received nothing until he later was given stock (in settlement of his claimed option), *LoBue* and *Smith* were held to control. Judge Cummings, concurring, thought that the petitioner had received an option which was assignable, but that it had no readily ascertainable fair market value under either the case law *or* the regulation.

Under the controlling case law, there are a number of reasons for concluding that Mr. Wanvig's options had no readily ascertainable fair market value: they were not exercisable immediately in full; they were subject to his continued employment; they were not traded on any established market; and they were not freely transferable. See also Mills v. Commissioner of Internal Revenue, 399 F.2d 744 (4th Cir. 1968) and Rank v. United States, 345 F.2d 337 (5th Cir. 1965).

This opinion has not resolved the issue of the validity or invalidity of the regulation, and I find no need to do so. As Judge Cummings stated in *LeVant*, at n. 3 on page 443 of 376 F.2d,

> "The Regulation appears to be a reasonable implementation of the *Smith* and *LoBue* cases, but it is unnecessary to pass on its validity. This opinion does not do so."

The case at bar is squarely covered by decisions of the U. S. Supreme Court, and that is sufficient to dispose of the matter.

## IV. CONCLUSION

The above opinion constitutes the court's findings of fact and conclusions of law in accordance with rule 52, Federal Rules of Civil Procedure.

Therefore, it is ordered that the plaintiff recover from the defendant the money paid to the defendant as a result of the erroneous disallowance of the deductions under section 163 of the Internal Revenue Code, plus interest. The remainder of the tax liability asserted against the plaintiff was, as heretofore stated, properly assessed. Each party shall bear his own costs and disbursements in these proceedings.