JACK E. GOLSEN AND SYLVIA H. GOLSEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5863–65.    Filed April 9, 1970.

---

*Julian P. Kornfeld* and *Robert B. Milsten*, for the petitioners.
*Harold Friedman*, for the respondent.

744

750

752

RAUM, *Judge:* This case involves an ingenious device which, if successful, would result in petitioner's purchase of a substantial amount of life insurance for the protection of his family at little or no aftertax cost to himself, or possibly even with a net profit in some years. The device is based on an unusual type of insurance policy that apears to have been specially designed for this purpose in which the rates were set at an artificially high level with correspondingly high cash surrender and loan values to begin immediately during the very first year of the life of the policy. The plan contemplated the purchase of a large amount of such insurance, the "payment" of the first year's premium, the simultaneous "prepayment" of the next 4 years' premiums discounted at the annual rate of 3 percent, the immediate "borrowing" of the first year's cash value at 4 percent "interest," and the immediate "borrowing" back of the full reserve value generated by the "prepayment," also at 4-percent "interest." Each year thereafter, the plan called for the "borrowing" of the annual increase in the loan or cash value of the policy at 4-percent "interest"; such increase, as a result of the artificially high premium, was more than sufficient to "prepay" the discounted amount of the premium which would become due 4 years thereafter. The net result of these complicated maneuvers would be that the insured's net out-of-pocket (pretax) expenditures each year would be equal to the true actuarial cost of the insurance benefits that he was purchasing (i.e., net death benefits in substantial amounts even after the policies had been stripped of their cash surrender values)—although, in form, he appeared to be paying large amounts of "interest." At the heart of the device is the deduction allowed in section 163(a) of the 1954 Code with respect to "interest paid * * * on indebtedness." And if the device were successful, the deduction would reduce the aftertax cost of the insurance either to a small amount, or nothing at all, or there might even be a net profit, depending upon the tax bracket of the owner of the policy. Apart from a portion of the amount paid the first year as "premiums" or "advance premiums," the remaining cash actually paid that year, and all other actual cash payments made by the insured throughout the life of the policy would be characterized as "interest."

The Government contends that the "loan" features of such insurance contracts are devoid of economic substance, that taking these features as part of an integrated plan, no true "indebtedness" was created nor

was any bona fide "interest" paid (regardless of whether any such feature might otherwise qualify under the statute if considered individually in isolation from the companion features),[6] that the substance of the transaction was that the "interest" merely reflected the annual price which the insured paid for life insurance protection, and that such payment is nothing more than a nondeductible personal expense.

The nature of the problem is one that the Court is obviously ill-equipped to handle without expert actuarial assistance, and it was fortunate in this case to have the benefit of the testimony of an actuary who appeared to us to be highly qualified, and who presented a clear and convincing analysis of the transaction before us. That testimony established to our satisfaction that the receipt and prepayment agreement and the loan agreement and assignment of policy had no essential relationship whatever to the insurance benefits provided under the insurance contracts, that when, in accordance with the prearranged plan, the policy was stripped of its artificially high cash surrender values, such policy was merely the equivalent of renewable term insurance, and that actuarially the net cash which the insured in fact paid to the insurance company, however described, merely represented the true cost of the insurance purchased. In the latter connection, the actuary testified as follows:

The payments that are denominated as interest, when reduced by the cash that was returned from the insurance company, are the amounts that are left to support the insurance. In other words, they are the cost to the insured for which, in return, he gets the death benefit protection promised by the insurance company.

We are satisfied as to the soundness of this testimony and accept it as true. The purported loans herein were utterly devoid of economic substance and were simply the means whereby the true cost of the insurance—i.e., the true premiums in respect of the insurance really purchased—was reflected in the purported "interest" allegedly "paid" on such "loans." The "interest" was thus not in fact compensation paid for the use of borrowed funds, the essential prerequisite for the deduction. See *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 560; *Deputy* v. *DuPont*, 308 U.S. 488, 497–498. As a consequence, if substance

---

[6] Compare *Gordon MacRae*, 34 T.C. 20, 27, affirmed and remanded 294 F. 2d 56 (C.A. 9), certiorari denied 368 U.S. 955:

"The steps taken, each in itself a legitimate commercial operation, were here each mirror images, and add up to zero. The various purchases and sales, each real *without the other*, neutralize one another and fairly shout to the world the essential nullity of what was done. No purchase and no sale is essentially identical with what was done here, i.e., identical and virtually simultaneous purchases and sales. The choice of the more complicated and involved method of doing nothing had no purpose, save the erection of the facade upon which petitioners now seek to rely."

rather than form were to govern the result herein, we would conclude that the "interest" deduction here claimed is not allowable.[7]

It has repeatedly been held that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern. The following represent merely a random selection from a wide variety of such cases that are too numerous for comprehensive listing: *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 265–267; *Commission* v. *Court Holding Co.*, 324 U.S. 331, 334; *Griffiths* v. *Helvering*, 308 U.S. 355; *Higgins* v. *Smith*, 308 U.S. 473; *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609; *Gregory* v. *Helvering*, 293 U.S. 465; *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26; *William R. Lovett*, 37 T.C. 317. The thought was forcefully expressed in the now familiar language of *Minnesota Tea Co.* v. *Helvering*, 302 U.S. at 613, as follows: "A given result at the end of a straight path is not made a different result because reached by following a devious path." In terms of the present case, "the given result at the end of [the] straight path" was the payment of the cost for insurance protection, and "the different result by following a devious path" was reflected in the attempt to make such payments appear to be interest through the involved "loan" transactions.

Insurance and annuity policies are peculiarly susceptible of manipulation so as to create illusion, and, in applying the substance-versus-form doctrine in such instances courts have at times referred to the transactions under review as "shams," or have characterized them as lacking in "business purpose," cf. *Knetsch* v. *United States*, 364 U.S. 361. Petitioners have seized upon such language, urging upon us that Golsen's transaction was not a "sham," that he was seriously buying

---

[7] Moreover, even apart from the essential character of the transaction as reflecting the payment of premiums rather than interest, the payments under consideration do not in fact appear to represent compensation for the use of borrowed funds. Thus in 1962 Golsen purported simultaneously to pay five premiums on each of his policies and then "borrow" back nearly the entire amount which he had just paid out. At the same time, he also purported to pay "interest" on the funds which he had just "borrowed." The net result of the transaction was that Golsen paid "interest" (at the rate of 4 percent) to Western in order to obtain the use of funds which were originally his and which he had transferred to Western (where they would "earn" 3 percent) for the very purpose of borrowing back—a transaction that was utterly lacking in economic substance. It is, of course, not unheard of for the owner of a policy to borrow the current cash value; one of the advantages of such a policy is that it provides a ready source of funds in the event of a need for cash for any purpose. But it is plain that from the outset Golsen intended to "borrow back" funds immediately after "paying" them over to Western. Unlike a lender, Western did not give up the use of funds from which it would have otherwise derived benefit. Unlike a borrower, Golsen did not obtain the use of funds which he would not otherwise have enjoyed.

life insurance for the protection of his family, and that there was thus no absence of "business purpose." The difficulty with that position is that, granted that there was a legitimate reason for the underlying acquisition of life insurance, there does not appear to be any such reason for the otherwise wholly meaningless superstructure of "loans" erected on that base. The point was articulated with telling clarity in *Ballagh* v. *United States*, 331 F. 2d 874 (Ct. Cl.), certiorari denied 379 U.S. 887, where the Court of Claims stated (p. 878):

plaintiff is wide of the mark in supposing that his primary purpose of providing retirement income can make valid what would otherwise be a sham. For the transaction which we find to be a sham is not the initial insurance contract but the prepayment of all of the premiums and the loan agreement. We do not question that plaintiff's motive in buying the policy was a legitimate one. However, the subsequent prepayment of all premiums by borrowing from the insurance company itself was not necessary in so providing retirement income, and we find that such loan transaction did "not appreciably affect his beneficial interest except to reduce his tax."

See also *Minchin* v. *Commissioner*, 335 F. 2d 30, 32 (C.A. 2).

Petitioners claim to find support for their position in this case by reason of the fact that Golsen's policies were issued in 1961 or early 1962. They rely upon section 264(a)(3) which was added to the 1954 Code in 1964 [8] and which provides as follows:

SEC. 264. CERTAIN AMOUNTS PAID IN CONNECTION WITH INSURANCE CONTRACTS.

(a) GENERAL RULE.—No deduction shall be allowed for—

\*    \*    \*    \*    \*    \*    \*

(3) Except as provided in subsection (c), any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance, endowment, or annuity contract (other than a single premium contract or a contract treated as a single premium contract) pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise).

\* \* \* Paragraph (3) shall apply only in respect of contracts purchased after August 6, 1963.

The point is defective. Of course, section 264(a)(3) does not prohibit the deduction in respect of policies purchased before August 6, 1963, and there was no specific prohibition prior thereto in the Internal Revenue Code against such deduction.[9] But petitioners' right to the claimed deduction is based upon section 163, not section 264. The latter simply denies, or disallows, or prohibits deductions that might other-

---

[8] See sec. 215, Revenue Act of 1964.

[9] See H. Rept. No. 749, 88th Cong., 1st Sess., pp. 61, 62; S. Rept. No. 830, 88th Cong., 2d Sess., pp. 77–79.

wise be allowable under some other provision of the statute. It does not confer the right to any deduction,[10] and the August 6, 1963, date represents merely the starting point for the operative effect of the specific disallowance provisions of section 264(a)(3). A closely parallel situation was considered in *Knetsch* v. *United States*, 364 U.S. at 367, where the Supreme Court held that a similar provision relating to deductions denied under section 264(a)(2) did not confer a right to deduction in respect of contracts purchased prior to the stated operative date of those provisions.[11] If the deduction sought by petitioners did not come within the provisions of section 163 prior to the 1964 amendment to the Code, nothing in that amendment retroactively created any such right. Cf. *W. Lee McLane, Jr.*, 46 T.C. 140, affirmed 377 F. 2d 557 (C.A. 9), certiorari denied 389 U.S. 1038.

The precise question relating to the deductibility of "interest" like that involved herein has been adjudicated by two Courts of Appeals. In one case, *Campbell* v. *Cen-Tex., Inc.*, 377 F. 2d 688 (C.A. 5), decision went for the taxpayer;[12] in the other, *Goldman* v. *United States*, 403 F. 2d 776 (C.A. 10), affirming 273 F. Supp. 137 (W.D. Okla.), the Government prevailed. *Goldman* involved the same insurance company, the same type of policies, and the same financial arrangements as are before us in the present case. *Cen-Tex* involved a different insurance company but dealt with comparable financing arrangements. Despite some rather feeble attempts on the part of each side herein to distinguish the case adverse to it, we think that both cases are in point. It is our view that the Government's position is correct.

Moreover, we think that we are in any event bound by *Goldman* since it was decided by the Court of Appeals for the same circuit within which the present case arises. In thus concluding that we must follow *Goldman*, we recognize the contrary thrust of the oft-criti-

---

[10] See *Weller* v. *Commissioner*, 270 F. 2d 294, 298 (C.A. 3), where the Court of Appeals said:

"Section 24(a) [predecessor sec. 264] applies to specific items that are *not* deductible. The section does not even purport to indicate what items are deductible and, therefore, legislative history indicating that annuity contracts were specifically not included therein fails to conclude the issue. Regardless of Section 24(a)(6), the taxpayers' payments must still qualify as interest under Section 23(b) [predecessor sec. 163] to be deductible." See also dissent of Wisdom, *J.*, in *United States* v. *Bond*, 258 F. 2d 577, 584 (C.A. 5), which was cited with apparent approval by the Supreme Court in *Knetsch* v. *United States*, 364 U.S. 361, 366 fn. 4.

[11] The committee reports with respect to those provisions, which the Supreme Court found not to be controlling in *Knetsch*, 364 U.S. at 369 fn. 7, bear a close resemblance to the committee reports relied upon by petitioners herein, fn. 9 *supra*.

[12] The same result was reached in two District Court cases. *Priester Machinery Co.* v. *United States*, 296 F. Supp. 604 (W.D. Tenn.); *Wanvig* v. *United States*, 295 F. Supp. 882 (E.D. Wis.), affirmed on another issue 423 F. 2d 769 (C.A. 7, 1970).

cized [13] case of *Arthur L. Lawrence*, 27 T.C. 713. Notwithstanding a number of the considerations which originally led us to that decision, it is our best judgment that better judicial administration.[14] requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone.[15]

Section 7482(a), I.R.C. 1954,[16] charges the Courts of Appeals with the primary responsibility for review of our decisions, and we think that where the Court of Appeals to which appeal lies has already passed upon the issue before us, efficient and harmonious judicial administration calls for us to follow the decision of that court. Moreover, the practice we are adopting does not jeopardize the Federal interest in uniform application of the internal revenue laws which we emphasized in *Lawrence*. We shall remain able to foster uniformity by giving effect to our own views in cases appealable to courts whose views have not yet been expressed, and, even where the relevant Court of Appeals has already made its views known, by explaining why we agree or disagree with the precedent that we feel constrained to follow. See Note, 57 Colum. L. Rev., *supra* at 723.

To the extent that *Lawrence* is inconsistent with the views expressed

---

[13] *Norvel Jeff McLellan*, 51 T.C. 462, 465–467 (concurring opinion) ; *Automobile Club of New York, Inc.*, 32 T.C. 906, 923–926 (dissenting opinion), affirmed 304 F. 2d 781 (C.A. 2) ; *Robert M. Dann*, 30 T.C. 499, 510 (dissenting opinion) ; Del Cotto, "The Need for a Court of Tax Appeals: An Argument and a Study," 12 Buffalo L. Rev. 5, 8–10 (1962) ; Vom Baur & Coburn, "Tax Court Wrong in Denying Taxpayer the Rule Laid Down in His Circuit," 8 J. Taxation 228 (1958) ; Orkin. "The Finality of the Court of Appeals Decisions in the Tax Court: A Dichotomy of Opinion," 43 A.B.A.J. 945 (1957) ; Note, "Heresy in the Hierarchy: Tax Court Rejection of Court of Appeals Precedents," 57 Colum. L. Rev. 717 (1957) ; Note, "Controversy Between the Tax Court and Courts of Appeals: Is the Tax Court Bound by the Precedent of Its Reviewing Court?" 7 Duke L.J. 45 (1957) ; Note, "The Tax Court, the Courts of Appeals, and Pyramiding Judicial Review," 9 Stan. L. Rev. 827 (1957) ; Case note, 70 Harv. L. Rev. 1313 (1957). See also *Sullivan* v. *Commissioner*, 241 F. 2d 46 (C.A. 7), affirmed 356 U.S. 27 ; *Stern* v. *Commissioner*, 242 F. 2d 322 (C.A. 6), affirmed 357 U.S. 39 ; *Stacey Mfg. Co.* v. *Commissioner*, 237 F. 2d 605 (C.A. 6).

[14] The importance of the *Lawrence* doctrine in respect of the functioning of this Court has been grossly exaggerated by some of the critics of that decision. That case was decided Jan. 25, 1957, and this is the first time during the intervening period of somewhat in excess of 13 years that the Court has ever deemed it appropriate to face the question whether or not to apply the *Lawrence* doctrine.

[15] Sec. 7482(b)(2), I.R.C. 1954, grants venue in any Court of Appeals designated by both the Government and the taxpayer by written stipulation. However, if the Court of Appeals to which an appeal would otherwise lie has already passed upon the question in issue, it is hardly likely that the party prevailing before the Tax Court would join in such a stipulation.

[16] SEC. 7482. COURTS OF REVIEW.

(a) JURISDICTION.—The United States Courts of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in section 1254 of Title 28 of the United States Code, in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury ; and the judgment of any such court shall be final, except that it shall be subject to review by the Supreme Court of the United States upon certiorari, in the manner provided in section 1254 of Title 28 of the United States Code.

herein it is hereby overruled. We note, however, that some of our decisions, because they involve two or more taxpayers, may be appealable to more than one circuit. This case presents no such problem, and accordingly we need not decide now what course to take in the event that we are faced with it.

In view of the conclusion reached above we find it unnecessary to consider the Government's alternative contention that the claimed deduction is in any event forbidden by section 264(a)(2).

Reviewed by the Court.

*Decision will be entered for the respondent.*

WITHEY, J., dissenting: While I agree with the conclusion of the Court on the merits of this case, I dissent on the reversal of this Court's position on *Arthur L. Lawrence*, 27 T.C. 713, by the majority.