FRANK SIGNORILE AND MARTHA SIGNORILE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Signorile v. Commissioner
Docket No. 472-85.
United States Tax Court
T.C. Memo 1986-565; 1986 Tax Ct. Memo LEXIS 38; 52 T.C.M. (CCH) 1080; T.C.M. (RIA) 86565; November 25, 1986. John R. Serpico, for the petitioners. Victoria Wilson Fernandez, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax, additions to tax for fraud and liability for self-employment tax for the taxable years 1973, 1974, 1975, 1976 and 1977 as follows: Section 6653(b) [1]
Section 1401
Year
Deficiency
Addition to Tax
Self-Employment Tax
1973
$3,727.00
$1,864.00
$864.00
1974
951.00
476.00
770.00
1975
6,839.00
3,420.00
1,114.00
1976
8,122.00
4,061.00
1,209.00
1977
3,767.00
1,884.00
697.00
*40 Respondent concedes that absent a finding of fraud the statute of limitations bars assessment and collection of the deficiencies for the taxable years 1973, 1974 and 1975. See section 6501(c). Respondent contends, however, that even without a finding of fraud, the statute of limitations remains open under section 6501(e)(1)(A) for the taxable years 1976 and 1977 because petitioners omitted from gross income an amount in excess of 25 percent of their gross income as stated on their returns for each year. The issues we must decide are (1) whether petitioner Frank Signorile understated petitioners' income tax liability for the taxable years 1973, 1974, 1975, 1976 and 1977 fraudulently and with intent to evade tax; [2] (2) if not, whether the statute of limitations bars assessment and collection of the deficiencies for 1976 and 1977, and (3) whether petitioners' unreported income is subject to self-employment tax pursuant to section 1401. *41 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Frank and Martha Signorile, are husband and wife who resided in Staten Island, New York at the time their petition was filed. Petitioner Frank Signorile (hereinafter referred to as "petitioner") was the defendant in the criminal case of United States of America v. Frank Signorile, Docket No. CR-81-00225 (E.D.N.Y. September 18, 1981). Petitioner pleaded guilty to Counts 1 and 6 of a 7 Count indictment. Count 1 alleged that petitioner used extortionate means to obtain repayment of a loan in 1977. Count 6 alleged that petitioner knowingly made a false statement by understating his interest income on his 1976 Federal income tax return in violation of section 7206(1). Petitioner was sentenced to 10 years on Count 1, to serve six months in prison and five years on probation with the remainder of the sentence suspended. Petitioner received a three-year suspended sentence on Count 6 and was placed on probation for five years. He was also fined $10,000.00 for Count 1 and $5,000.00 for Count 6. The decision in that case is final. Petitioner was an experienced businessman who owned a sandwich *42 shop until 1976. On his income tax returns for 1973 through 1976 petitioner stated that he was "self-employed;" on his income tax return for 1977 he stated his occupation as "investor." Petitioner invested in several partnerships and reported losses from them on his income tax returns for 1975, 1976 and 1977. Petitioner also reported losses from his small business corporation, Frank Signorile, Inc., on his income tax return for 1974 and interest from various bank accounts on his returns for each of the years in issue. [3] Between 1973 and 1977 petitioner made loans to various individuals and had loans outstanding due from various individuals. Petitioner testified on direct examination that he did make loans, then contradicted himself and testified that he had not made loans but rather had invested in several business ventures. When confronted on cross-examination with tape *43 recorded conversations between himself and an individual who owed him money, however, petitioner admitted that his "investments" were in fact loans. Petitioner pled guilty to using extortionate means to collect money owed to him. In his petition to this Court, petitioner also characterized the financial transactions at issue as loans. Petitioner kept no records of the loans he made and nearly always transacted business in cash. Petitioner received interest payments on his loans, which he called "vigorish" or "vig," typically at a rate of three to five percent per week. Petitioner at first testified that he did not know what the term "vigorish" meant, and then testified that it was a term used in banking and the stock market to mean interest. In fact, "vigorish" is a term generally used by loan sharks, bookies or other similar moneylenders to mean interest. Petitioner admitted prior to trial that he received $13,100.00 in interest income on loans made between 1973 and 1977. [4] He did not report this income on his tax returns. Petitioner stated that he did not report the interest as income because he received only $45,000.00 in principal payments on total loans of $60,000.00 *44 and therefore suffered losses during the years in issue. He did not, however, claim any deduction for his "losses" from his loan activities. Respondent contends that petitioner received $85,615.00 in interest payments on total loans of $71,200.00. In addition, respondent contends that petitioner recovered a significant part of the principal on the loans he made. Robert Lander is an individual to whom petitioner made numerous loans between 1973 and 1977. Lander was afraid of petitioner because petitioner threatened him and hit him when he could not make payments. Lander testified that he first met petitioner in 1964 or 1965 and began borrowing money from him at that time. Petitioner testified that he did not meet Lander until 1973. In either case, petitioner and Lander agree that the first major loan that petitioner made to Lander was in 1973. Lander borrowed $4,000.00 from petitioner in 1973 to purchase Grumpies, a gas station. He *45 agreed to pay petitioner $500.00 per week in interest until such time as he could repay the principal in a lump sum. Lander was able to make the weekly payments for about 8 months, but then the station began to go under because Lander was taking out $500.00 per week to pay petitioner and had to bounce checks to pay for gas.Petitioner lent Lander another $3,000.00 to keep the station operating but in exchange required Lander to transfer title to Grumpies to his corporation, Frank Signorile, Incorporated. Later the same year Lander's father paid petitioner $7,000.00 to get his son out of debt. [5] Petitioner subsequently sold the station and received $2,500.00 after paying off creditors. Lander received nothing from the sale of the station. On a total loan of $7,000.00, petitioner therefore received $17,000.00 in interest payments ($500.00/week X 34 weeks). *46 Petitioner next loaned Lander money to purchase a van. The record is not clear as to when Lander borrowed the money or whether he purchased one van or two. Lander testified that he borrowed $2,700.00 in the spring of 1974 and paid petitioner $95.00 per week in interest for 8 or 9 months. He also testified that he was still making payments on the loan in 1976, but that Harvey Goldstein took over the payments sometime in 1976 when Lander purchased another van. Lander testified that the second van was purchased in petitioner's name because he signed for a loan with GMAC for Lander. Petitioner could not recall lending Lander $2,700.00 but agreed that he had countersigned a loan with GMAC in 1975. We find that petitioner loaned Lander $2,700.00 to purchase a van around April 1974 and that Lander continued to make weekly interest payments until mid-June 1975. Petitioner thus received $6,175.00 in interest payments on his loan of $2,700.00 ($95.00/week X 65 weeks). We also believe that petitioner countersigned a loan for Lander in 1975 or 1976. In April or May 1975 Lander and his partners, Steve Roe and Al Sheiber, met Mike and Marty Zilverberg (a/k/a Zilberberg), who offered to *47 sell them a truckload of stolen soap for $20,000.00. Lander and his partners agreed but the Zilverbergs informed the FBI of the transaction, and when they delivered the soap to the warehouse, Lander and his partners were arrested and charged with theft from an interstate shipment. Lander did not know at the time that the Zilverbergs had called the FBI and believed that he and his partners still owed them $20,000.00. Thus, when the Zilverbergs offered to forgive the debt if Lander would introduce them to petitioner and convince him to loan them $20,000.00, Lander agreed. Petitioner loaned $20,000.00 to Lander for the Zilverbergs. The Zilverbergs gave petitioner four truck titles as collateral and agreed to make weekly interest payments until they could pay off the loan. They claimed they would be able to repay the money within a few weeks. Lander testified that the interest payments were $900.00 per week, and petitioner testified that the payments were $300.00 per week. We find that the agreed interest payments were $900.00 per week because petitioner generally charged three to five percent interest per week on his loans and $900.00 is within that range while $300.00 is not. *48 The Zilverbergs made weekly interest payments for approximately nine weeks and then left the state in August 1975 without repaying the principal. The collateral they had put up turned out to be worthless, and because petitioner made the loan to Lander for the Zilverbergs, he held Lander and his partners responsible for its repayment. Lander and his partners were not able to pay petitioner $900.00 per week so petitioner agreed to accept $3,000.00 in interest up front in August or September 1975 and allowed them to make $500.00 per week principal payments. [6] After several weeks Lander and his partners were unable to make the $500.00 per week payments. Lander and one of his partners, Steve Roe, decided to borrow more money from petitioner to start a business which they hoped would make enough to get them out of debt. On October 23, 1975 petitioner lent Lander and Roe $15,000.00 to open a gas station ("Look Oil Company"). Lander and Roe paid $400.00 per week in interest on the $15,000.00 *49 loan and continued to make $500.00 per week principal payments on the Zilverberg loan until February 1976. In January they began to have problems paying petitioner because they were running out of gas and needed money to buy more. In February Roe had a friend tell petitioner that he had been arrested. Petitioner loaned Roe $1,500.00 for bail, charging $45.00 per week in interest. Lander and Roe used the money to buy gas for the station. In February, Lander borrowed an additional $15,000.00 from petitioner for the station. In exchange for the loan, petitioner forced Roe out of the station and required Lander to transfer the station to another of his corporations, Signorile Incorporated. He also brought in a new manager, Harvey Goldstein. Lander paid $400.00 per week on this loan, bringing his weekly payments to $1,345.00 per week. In mid-May 1976 Lander borrowed $10,000.00 more. He used part of the money to purchase a Getty gas station and the rest to buy supplies for the Look station. Petitioner charged $500.00 per week interest on the loan, bringing Lander's weekly payments up to $1,845.00. Although the record is not clear, petitioner converted the $500.00 per week principal *50 payments on the Zilverberg loan to interest payments in 1975 or 1976. At one point Lander testified that the $500.00 per week payments converted to interest when petitioner loaned Lander the first $15,000.00 in October 1975, but later testified that the $500.00 did not become interest until February 1976 when petitioner loaned him the second $15,000.00. We find that the $500.00 per week payments converted to interest sometime in 1976, but only for a short period of time before the stations went out of business. By mid-June both stations went out of business because Lander had no more money to buy gasoline and other supplies. Petitioner sold both stations in July. He claims to have received $19,000.00 on the sale of the Look station while Lander claims petitioner received $24,000.00. Lander did not know how much petitioner received for the Getty station, but petitioner claimed he was able to "salvage" only $5,000.00 on the sale.Lander received nothing from the sale of either station. After selling the stations petitioner informed Lander that he still owed him $32,000.00. Lander agreed to pay him $500.00 per week in principal. Lander made these payments from August or September *51 1976 until June 1977. Petitioner then reduced the payments to $200.00 per week. Lander paid this amount for a few weeks before leaving on a six-week trip. While Lander was away, petitioner converted the $200.00 principal payments to interest. When Lander returned he had no way to pay petitioner the $1,200.00 in interest that he owed him for the weeks he was away and went to the FBI. Petitioner also loaned $5,000.00 to Herbert Mackler in November 1976. Mackler had been helping Lander make payments to petitioner and borrowed the money at Lander's suggestion. Mackler paid petitioner $250.00 per week in interest for approximately six months. He then made a $500.00 principal payment which reduced his weekly payments to $225.00. After paying $225.00 for three months Mackler made another principal payment which reduced the weekly interest to $75.00. Mackler paid the $75.00 per week for a few weeks and eventually paid off the loan. Petitioner received $9,425.00 in interest over a period of approximately one year on his $5,000.00 loan to Mackler. Lander went to the FBI in September 1977. He agreed to meet with or call petitioner four more times and allowed the FBI to tape the *52 conversations. In the course of their meetings and telephone conversations petitioner repeatedly threatened Lander and admitted to having made numerous loans to and received usurious interest payments from Lander and others. Lander testified several times that he continued to pay petitioner because he was afraid of him. The tape recordings corroborate much of Lander's testimony. Lander has been given a new identity under the Federal Witness Protection Program. OPINION Respondent contends that petitioner fraudulently understated his income for the taxable years 1973 through 1977. The existence of fraud is a factual question to be resolved by an examination of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent must establish, by clear and convincing evidence, that petitioner acted with specific intent to evade taxes that he knew or believed he owed. Stephenson v. Commissioner,79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Rule 142(b).[7] Fraud is never presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), *53 but may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. at 1005-1006. Petitioner's entire course of conduct must be examined to determine whether the requisite fraudulent intent exists. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984); Stone v. Commissioner,56 T.C. 213, 223-224 (1971). Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia of fraud is persuasive circumstantial evidence. Solomon v. Commissioner,732 F.2d at 1461; Beaver v. Commissioner,55 T.C. at 93. First, a pattern of underreporting over an extended period of time is indicative of fraud. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968); Brooks v. Commissioner,82 T.C. 413, 431 (1984), *54 affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Second, a failure to maintain adequate records may indicate fraudulent intent. Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), cert. denied 397 U.S. 962 (1970). Third, dealings in cash may also indicate fraud. Friedman v. Commissioner,421 F.2d 658 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Nicholas v. Commissioner,70 T.C. 1057, 1066 (1978). Fourth, a taxpayer's business experience and knowledge of the tax laws may tend to prove or disprove the existence of fraud. See O'Connor v. Commissioner,412 F.2d 304, 310 (2d Cir. 1969), cert. denied 397 U.S. 921 (1970). Fifth, a taxpayer's dishonesty in business transactions or willingness to defraud others may indicate a willingness to defraud respondent. Afshar v. Commissioner,T.C. Memo. 1981-241, affd. without published opinion 692 F.2d 751 (4th Cir. 1982), cert. denied 461 U.S. 928 (1983). Finally, a conviction under section 7206(1), although it does not conclusively establish fraud, *55 is a factor indicative of fraud. Wright v. Commissioner,84 T.C. 636, 643-644 (1984). All of these factors are present in the instant case. Petitioner did not report interest income from his moneylending activities in any of the years in issue although he concedes that he made loans and collected interest on them. He also kept no records of his lending activities, made loans in cash and collected all payments in cash except for endorsements on a few checks written by Mackler to Lander, making it very difficult to reconstruct what loans and payments were made. Petitioner was an experienced businessman. He knew that he was required to report interest as income on his tax returns because he reported interest earned on bank accounts and other investments on his returns for 1973 through 1977. He also knew that he was entitled to claim a deduction for loans that were not repaid. Nonetheless, petitioner did not report interest income from his loans because he testified that he suffered more than offsetting losses on some loans that were not fully repaid. He did not, however, claim a deduction for the losses he allegedly sustained. Petitioner lent money to various *56 individuals charging usurious interest rates. He was convicted of using extortionate means to obtain repayment of his loans. Petitioner's unlawful business activities indicate a willingness to defraud persons with whom he transacted business, and, we believe, also a willingness to defraud the government. Petitioner pleaded guilty to making a false statement on his income tax return for 1976 in violation of section 7206(1). Although a conviction under section 7206(1) does not collaterally estop petitioner from denying respondent's allegation of fraud, see Wright v. Commissioner,84 T.C. at 643, it is a factor to consider in determining whether petitioner acted with intent to evade taxes in 1976. We conclude that respondent has sustained his burden of proving fraud and that petitioner is therefore liable for additions to tax for fraud pursuant to section 6653(b) for each of the years in issue. The numerous indicia of fraud present in this case convince us that petitioner purposely understated his income by failing to report interest income for the taxable years 1973, *57 1974, 1975, 1976 and 1977 with the specific intent to evade taxes that he knew he owed. The record shows that petitioner had unreported interest income for each of the years in issue. The following summarizes the unreported interest income that petitioner received between 1973 and 1977: Interest Payments
Loan
Date
1973
1974
1975
1976
1977
1. Grumpies Gas
Station
1973
$17,000.00
$ 4,000.00
$ 3,000.00
1973
2. Van
$ 2,700.00
4/74
$3,610.00
$ 2,565.00
3. Zilverberg
(payments by
Zilverbergs)
$20,000.00
5/75
$ 8,100.00
4. Zilverberg
(payments by
Lander)
$20,000.00
5/75
$ 3,000.00
$ 2,000.00
5. Look Oil
Company
10/75
$15,000.00
$ 3,600.00
$ 9,200.00
6. Look Oil
Company
2/76
$15,000.00
$ 7,600.00
7. "Bail" Loan
2/76
$ 1,500.00
$ 855.00
8. Getty Station
5/76
$10,000.00
$ 2,000.00
9. Mackler
$ 5,000.00
11/76
$ 1,500.00
$7,925.00
TOTALS
$17,000.00
$3,610.00
$17,265.00
$23,155.00
$7,925.00
The following summarizes how the foregoing interest calculated: 1. 1973
$3,000.00 Loan - $500.00/week X 34 weeks
2. 1974
$2,700.00 Loan -
1974: $95.00/week X 38 weeks (April-December)
1975: $95.00/week X 27 weeks (January-mid-June)
3. 1975
$20,000 Loan - (payments by Zilverbergs)
$900.00/week X 9 weeks (May-August)
4. 1975
$20,000.00 Loan - (payments by Lander and partners)
1975: $3,000.00 interest payments
1976: $500.00/week X 4 weeks (between
January and mid-June)
5. 1976
$15,000.00 Loan -
1975: $400.00/week X 9 weeks (late October-December)
1976: $400.00/week X 23 weeks (January-mid-June)
6. 1976
$15,000.00 Loan - $400.00/week X 19 weeks
(February-mid-June)
7. 1976
$1,500.00 Loan - $45.00/week X 19 weeks
(February-mid-June)
8. 1976
$10,000 Loan - $500.00/week X 4 weeks (May-June)
9. 1976
$5,000.00 Loan -
1976: $250.00/week X 6 weeks (late November-December)
1977: $250.00/week X 20 weeks
1977: $225.00/week X 12 weeks
1977: $ 75.00/week X 3 weeks
*58 Petitioner also recovered a significant part of the principal on the loans he made between 1973 and 1977. In 1973 he loaned Lander a total of $7,000.00 to purchase and operate Grumpies gas station. Lander's father repaid this amount in full the same year. In 1974 Lander purchased a van with $2,700.00 he borrowed from petitioner. The record gives no indication that petitioner recovered any of the principal on that loan. In 1975 petitioner lent $20,000.00 to Lander for the Zilverbergs. Lander and his partners made principal payments on this loan after the Zilverbergs disappeared. The payments were $500.00/week and continued from September 1975 until mid-May of 1976, when petitioner converted the payments to interest. Petitioner thus recovered $18,000.00 in principal ($500.00/week X 36 weeks) on the $20,000.00 loan. Petitioner made several loans to Lander in connection with the Look and Getty gas stations in 1975 and 1976.He loaned Lander $15,000.00 in October 1975, another $15,000.00 in February 1976 and $10,000.00 in May 1976. Both stations went out of business in June 1976 and petitioner sold them in July. He recovered $5,000.00 on the sale of the Getty station and at *59 least $19,000.00 on the sale of the Look station. In September 1976 Lander began to pay petitioner $500.00/week in principal to reduce the $32,000.00 that petitioner claimed Lander still owed him. These payments continued for approximately 40 weeks, until June 1977. Petitioner thus recovered an additional $20,000.00 of principal. In June 1977 petitioner reduced Lander's weekly principal payments to $200.00. He collected this amount for about two weeks, giving him an additional $400.00 recovery of principal. Petitioner also loaned $5,000.00 to Mackler in 1976. Mackler repaid the full principal amount in 1977. Because we have found that petitioner's understatements of income were due to fraud, the statute of limitations does not bar assessment or collection of the taxes due for any of the years in issue. Section 6501(c). Consequently, we do not reach the issue of whether the statute of limitations remains open for the taxable years 1976 and 1977 under section 6501(e)(1)(A). The final issue we must address is whether petitioner's earnings from his money lending activities are subject *60 to self-employment tax pursuant to section 1401. Section 1401 imposes a tax on net earnings from self-employment income, defined as gross income derived from carrying on a trade or business, less allowable deductions. Sections 1401, 1402. Respondent contends that petitioner was engaged in the trade or business of lending money during the years in issue. Petitioner argues that he did not carry on a business and that any income he received was a return on his investments and/or interest. For purposes of section 1402(c), with certain exceptions not relevant here, trade or business has the same meaning as it does under section 162. The Supreme Court has stated that the test of whether an individual is carrying on a trade or business requires an examination of all of the facts and circumstances involved in each case. Higgins v. Commissioner,312 U.S. 212 (1941); see United States v. Pyne,313 U.S. 127 (1941); City Bank Farmers Trust Co. v. Helvering,313 U.S. 121 (1941). *61 Justice Frankfurther, in a concurring opinion in Deputy v. du Pont,308 U.S. 488 (1940), decided a year before the facts and circumstances approach was adopted, defined a trade or business as an activity involving "holding one's self out to others as engaged in the selling of goods or services." Although Frankfurter's concurring opinion was never expressly adopted by the Supreme Court, several circuit courts have adopted it as an essential prerequisite to a finding that a taxpayer is engaged in a trade or business. See Estate of Cull v. Commissioner,746 F.2d 1148, 1151-1152 (6th Cir. 1984), cert. denied    U.S.   , 105 S. Ct. 2701 (1985); Gajewski v. Commissioner,723 F.2d 1062, 1066 (2d Cir. 1983), cert. denied 469 U.S. 818 (1984); Noto v. United States,598 F. Supp. 440 (D. N.J. 1984), 770 F.2d 1073 (3d Cir. 1985), affg. by unpublished order. Other factors that courts have considered are whether the taxpayer engaged in regular or continuous activity, Stanton v. Commissioner,399 F.2d 326, 329-330 (5th Cir. 1968); McDowell v. Ribicoff,292 F.2d 174, 178 *62 (3d Cir.), cert. denied 368 U.S. 919 (1961), and whether the taxpayer intended to make a profit. Bessenyey v. Commissioner,379 F.2d 252, 255-256 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); Daily Journal Co. v. Commissioner,135 F.2d 687, 688 (9th Cir. 1943). This Court, in Gentile v. Commissioner,65 T.C. 1 (1975), adopted Justice Frankfurter's test, holding that a professional gambler's winnings were not derived from a trade or business because "he neither provided nor held himself out as a provider of goods and services to any other person." In 1983, however, in Ditunno v. Commissioner,80 T.C. 362 (1983), we overruled Gentile. Holding one's self out as a provider of goods and services is thus no longer a prerequisite to a finding by this Court that a taxpayer is engaged in a trade or business. The Second Circuit has expressly rejected our approach in Ditunno and continues to consider holding one's self out as a provider of services as the appropriate minimum standard for a finding that taxpayer is carrying on a trade or business.See Gajewski v. Commissioner,723 F.2d at 1066-1067. *63 [8] Because an appeal in this case will lie to the Second Circuit, we are bound by the precedent in that circuit. Golsen v. Commissioner,54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir.), cert. denied 404 U.S. 940 (1971). We must therefore determine whether petitioner held himself out as a provider of goods and services.
In Higgins v. Commissioner,the Supreme Court held that the management of one's own investments, regardless of the time and resources required, could not be a trade or business. Higgins v. Commissioner,312 U.S. at 212. If a taxpayer holds himself out as a provider of investment or other services to even one individual other than himself, however, he will be held to be engaged in a trade or business.See *64 Grosswald v. Schweiker,653 F.2d 58, 59-60 (2d Cir. 1981); accord Steffens v. Commissioner,707 F.2d 478, 482 (11th Cir. 1983). Petitioner loaned money to Robert Lander and, through him or on his behalf, to the Zilverbergs, Steven Roe and Herbert Mackler. He collected interest or principal payments on these loans. Although petitioner did little other than collect money on his loans, he provided money lending services to several individuals. Petitioner also engaged in regular or continuous money lending activities from which he anticipated making a profit. See Stanton v. Commissioner,399 F.2d at 329-330; Bessenyey v. Commissioner,379 F.2d at 255-256. We therefore hold that petitioner was engaged in the trade or business of lending money and sustain respondent's determination that petitioner is liable for self-employment tax pursuant to section 1401. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Respondent has on brief conceded that petitioner Martha Signorile is not liable for the additions to tax. Because she filed a joint income tax return with her husband, she is jointly and severally liable for the amount of the deficiency for each year. Martha did not raise the issue of her being relieved from liability for any deficiency pursuant to section 6013(e).↩
3. There is no Schedule B, Dividend and Interest Income, attached to petitioner's 1973 income tax return. Petitioner, however, reported $1,651.58 in interest income and there is no indication that it came from any source other than the bank accounts from which he earned interest income in subsequent years.↩
4. On cross-examination petitioner at first denied receiving part of the interest income but when confronted with statements he made on which the stipulation of facts was based he admitted that he may have received some interest payments.↩
5. Petitioner testified that he invested in Grumpies as a partner with Lander and that the station was at all times in his corporation's name. He further testified that Lander forged petitioner's signature on $6,000.00 in checks out of petitioner's corporate account to Mobil Oil. The checks bounced and Lander's father paid petitioner $6,000.00 to cover them. When petitioner sold the station, he netted $2,500.00 but suffered a loss on the transaction because he never got back his initial $4,000.00 investment. We do not believe petitioner's version of the facts. He admitted on cross-examination that his dealings with Lander were loans and not investments. We also do not believe that petitioner would have given Lander access to his checkbook or that Mobil would wait until the station had bounced $6,000.00 worth of checks before it stopped accepting the checks.↩
6. Petitioner contends that Lander and his partners paid him only the $300.00 per week that he had been collecting from the Zilverbergs. We do not believe his testimony on this point either.↩
7. All rule references are to the Tax Court Rules of Practice and Procedure.↩
8. On remand see Gajewski v. Commissioner,84 T.C. 980 (1985). The issue of which standard is appropriate is presently pending before the Supreme Court. See Groetzinger v. Commissioner,771 F.2d 269 (7th Cir. 1985), cert. granted    U.S.    (1986)↩.