INTERNATIONAL TALC COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24087. Promulgated December 29, 1950.

*Wesley E. Disney, Esq.*, and *Lawrence H. Gall, Esq.*, for the petitioner.

*Clay C. Holmes, Esq.*, for the respondent.

984

OPINION.

VAN FOSSAN, *Judge:* The difference in this case is largely a matter of definition. Petitioner rests its case on two contentions, (1) that Congress intended and used the word "talc" in the percentage depletion statutes in its usual significance as known and accepted by commerce and industry, and (2) that the processes of crushing and grinding applied by petitioner were the "ordinary treatment processes" necessary to produce its "commercially marketable mineral product" and are included in the term "mining" as provided and defined in section 114 (b) (4) (B) of the Internal Revenue Code. Respondent, holding the contrary, urges that petitioner's allowance for percentage depletion should be limited to the talc content appearing in its product, and that the "gross income from the property" should be based only on the actual mining operation, thus excluding the cost of milling or grinding the crude ore. In order to arrive at the result indicated by respondent in the notice of deficiencies he calculated an artificial or theoretical sale price for crude talc ore at the head of the mine shaft. He then assumed that 40 per cent of such assumed sales price represented the sales price of the chemically pure talc content of the crude ore.

At the inception of this consideration it is well to have clearly in mind certain facts as proved by the record, among which are the following:

Talc is not a basic element. It is essentially a hydrous magnesium silicate with varying contents of associated and constituent minerals or impurities. It is a nonmetallic mineral which occurs in nature as a soft rock in veins, pits, pockets, and lenses in a wide variety of forms and types. Petitioner removes the crude ore from the underground mine workings by means of a deep shaft, transports the ore to its mills (8 miles distant) and there grinds the ore to a powdered form, sacks it in 50-pound sacks and ships it to its customers. In the grinding process nothing is added and nothing is removed. There is no waste in grinding nor is there any beneficiation. Except for the change in form from the rock or crude ore state to the powdered form, the product sold is the same as when brought to the mouth of the shaft.

Expert witnesses of notable qualifications and long experience testified and established that the product so mined and ground is and has been known for many years as talc throughout the producing and consuming industry; that as such it has been accepted and classified

not only in the producing and consuming industry but by railroads in freight tariffs, by technologists and geologists, as well as in popular parlance. It was classified as talc by the late Office of Price Administration, the late War Production Board and the Department of Justice in actions against its producers. It was also established that, with the exception of museum specimens, no marketable mineral is found in nature or sold in the trade as theoretically or chemically pure talc.

The evidence further establishes that, with the exception of certain producers in the far West, whose production constitutes a small part of the total output, petitioner's procedure in mining and milling talc is typical throughout the industry. With the noted exception, no crude talc ore is sold in the country and what is so sold in the West must thereafter be milled before it becomes marketable.

Starting with the readily to be accepted premises that Congress, in legislating, deals with realities and uses words and terms in their ordinary, obvious, and generally accepted meanings, we find no evidence in the legislative history of the depletion statutes that, in granting the right of depletion to producers of talc, Congress meant "theoretically or chemically pure talc" or talc ore nor anything other than talc as the product was known in industry and commerce, specifically the product sold by petitioner and other producers.

During the years in issue section 23 (m) provided "In the case of mines * * * a reasonable allowance for depletion * * *." Section 114 (b) (4) (A) provided that "The allowance for depletion under section 23 (m) shall be * * * in the case of metal mines * * * talc * * * mines * * * or deposits, 15 per centum * * * of the gross income from the property * * *." This allowance for talc was first specifically granted in the Revenue Act of 1942. In testimony before the Ways and Means Committee various witnesses testified as to the production of talc, in all cases referring to the article of commerce such as was produced and sold by petitioner. No one suggested that in granting the right to depletion they were referring to the chemically pure product. The proponents of the legislation were practical businessmen, not scientists. All reasonable inferences from an extensive examination of the legislative history point the same conclusion—that the word "talc" was used in its generally accepted commercial and industrial interpretation.

Conclusive evidence of the Congressional intent and what would seem even to the casual reader to be a complete answer to any doubts appears in section 114 (b) (4) (B), I. R. C., as amended, which reads, in part, as follows:

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining.

The term *"mining"*, as used herein, *shall* be considered to *include* not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term *"ordinary treatment processes"*, as used herein, *shall include* the following: (i) In the case of coal * * * (ii) in the case of sulphur * * * (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt and minerals which are customarily sold in the form of a crude mineral product * * * (iv) *in the case of* lead, zinc, copper, gold, silver, or fluorspar ores, potash, and *ores which are not customarily sold in the form of the crude mineral product— crushing, grinding*, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation * * * or by substantially equivalent processes or combination of processes * * *. [Emphasis added.]

The above definition, in our judgment, stands as an insuperable barrier to respondent's interpretation. It is in effect a positive prohibition against the doing of the very thing here done by respondent in determining the proposed deficiencies. The evidence shows that milling of the ore at their own mills prior to sale, was the normal treatment; that the processes of grinding, grading, and sacking of the product were the "ordinary treatment processes usually applied by mine owners or operators in order to obtain the commercially marketable mineral product." As above observed, there was no recognized market for crude talc and it was not customarily sold in the form of a crude mineral product. The first commercially marketable form of talc was and is in the powdered form in which it comes from mills such as petitioner's. Congress clinched the matter by providing by way of definition that "mining" includes, in the case of ores not customarily sold as a crude mineral product, crushing and grinding. It went even further and included as a part of mining the beneficiation of such product and various other processes.

Thus it is that we find in the law as enacted by Congress complete authority for and justification of petitioner's action in computing its tax deduction for depletion. The conclusion is so clear that we deem it unnecessary to enter into a discussion of the several cases cited by the parties.

We are of the opinion that petitioner's position is well buttressed in the law and by industrial and commercial usage; that in the case of talc, the cost of milling is a part of the cost of "mining", which should be included in determining petitioner's "gross income from the property." Respondent's approach to the problem is predicated on a purely hypothetical concept and ignores entirely the realities of the talc industry.

*Decision will be entered under Rule 50.*