MATAGORDA SHELL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54959.    Filed February 28, 1958.

*Robert Ash, Esq.*, and *Carl F. Bauersfeld, Esq.*, for the petitioner.

*Paul M. Newton, Esq.*, for the respondent.

OPINION.

Rice, *Judge:*\* The first issue raised in this proceeding is the amount of gross receipts or gross income from the property which petitioner realized from its mining operations in Matagorda Bay for purposes of computing its percentage depletion deduction under sections 23 (m) and 114 (b) (4) (A) and (B).[1]  Such sections provide a depletion

---

\*The report in this case was prepared by Judge Rice during his lifetime and was adopted thereafter by Court Review.

[1] SEC. 23.  DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

   \*       \*       \*       \*       \*       \*       \*

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*

SEC. 114.  BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

   \*       \*       \*       \*       \*       \*       \*

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

(A) In General.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

allowance for oyster shells in the amount of 5 per cent of the gross receipts from the sale of the first commercially marketable mineral product which is reached in the operation of mining such shells.

Since the passage of the Revenue Act of 1943, 58 Stat. 21, gross receipts or gross income from the property for purposes of computing percentage depletion has meant "gross income from mining." The term "mining" as used in the statute specifically includes not merely the extraction of ores and minerals, but also the ordinary treatment processes normally applied by owners and operators in order to obtain the first commercially marketable mineral product. The Code further defines "ordinary treatment processes," in the case of minerals such as oyster shells, which are customarily sold in the form of a crude mineral product, as including sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment.

By section 207 of the Revenue Act of 1950, 64 Stat. 906, Congress further provided that the term "gross income from mining" should include within its meaning, in addition to the ordinary treatment processes already provided for, "so much of the transportation * * * from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills."

Petitioner contends that its gross income from mining or its gross income from the property for purposes of the depletion allowance, is the amount of its gross receipts from the sale of the shells loaded for

---

(i) in the case of * * * oyster shell, clam shell, * * * 5 per centum,

\* \* \* \* \* \* \*

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining" as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. The term "ordinary treatment processes", as used herein, shall include the following: * * * in case of * * * minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; * * *
29 T. C.

shipment on the docks, less the sales price received for shells purchased for sale and less royalties paid to the State of Texas, since its first commercially marketable mineral product was oyster shells loaded for shipment on shore. It says this is so because "the conveyance of the shell to dockside is an integral part of the mining process" because no sales to customers are or could be made until the shells are stockpiled and ready for shipment. It contends that the transportation in question here is closely akin to hauling coal out of the mine. It further argues that its initial extraction or dredging operations would be futile unless the shell was immediately hauled away from the dredge site since there are not and could not be any storage facilities for the shells on the dredge.

The respondent, on the other hand, determined that petitioner's first commercially marketable mineral product, within the meaning of the statute, was the oyster shells on the dredge after they had been washed and screened. He contends that hauling the shells from the dredge to shore was nothing more than moving an already salable product from one place to another. He therefore argues that such part of petitioner's gross receipts as was attributable to transporting the shells by barge from the dredge to the shore, where they were stockpiled and later loaded for shipment to petitioner's customers, should be deducted from the amount of gross income from mining, as computed by petitioner, for purposes of its depletion deduction.

In support of his determination, the respondent relies on *Zonolite Co.* v. *United States*, 211 F. 2d 508 (C. A. 7, 1954). In that case, the taxpayer mined vermiculite from open-pit mines. The crude mineral was crushed, dried, and screened at a plant approximately one-half mile from the pit. From the processing plant it was loaded in trucks and hauled by a private hauling contractor to the nearest railhead at Libby, Montana, a distance of approximately 7 miles. The mineral was there loaded into railroad cars for shipment to the taxpayer's customers. In computing its percentage depletion, the taxpayer used its gross selling price f. o. b. Libby, Montana. The Commissioner determined, and the court agreed, that the amount which the taxpayer paid to the private trucking company for hauling the mineral from the processing plant to Libby should be deducted from its gross receipts to determine its gross income from mining for purposes of computing its allowable percentage depletion, on the ground that the transportation of the mineral from the processing plant to the railhead was not an ordinary and necessary treatment process. That case is not controlling here because the transportation there, which is analogous to the transportation in issue here, was the one-half-mile haul from the pit to the processing plant and not the 7-mile haul from the plant to the railhead. The Court of Appeals said (p. 512), "The vermiculite concentrate was already a commercially marketable min-

eral product when it started on the seven-mile journey to Libby." Here, the record demonstrates and we found as a fact that petitioner's first commercially marketable mineral product was the shells loaded for shipment on shore.

Both parties seem to ignore, on brief, the 1950 amendment to section 114 (b) with respect to transportation as being a part of "mining." We believe that change in the law is controlling here. The respondent stated in a footnote in his brief that the 1950 amendment "has no application to this case since there is apparently no contention here made by the petitioner that the transportation here involved is incurred in order to transport the shells to a plant or mill on shore where ordinary treatment processes would be applied." The petitioner mentions the amendment, in passing, but bases its argument on the proposition that the barge transportation was a part of the "extraction process" and says the shore in this case is comparable to the mouth of a coal mine.

In any event, we think the case here clearly falls within the express provisions of the statute, as amended by the Revenue Act of 1950, *supra*. Gross receipts or gross income from the property means the amount of "gross income [received] from mining" the first commercially marketable mineral product reached in petitioner's operations. "Mining," as defined by the statute, includes extraction of the mineral, ordinary and necessary treatment processes applied thereto, and transportation between the point of extraction and the plants where such treatment processes are applied, up to a distance of 50 miles. Petitioner maintained facilities on shore for stockpiling, drying, and loading the shells which we think were equivalent to a plant, within the meaning of the statute. Loading for shipment at a processing plant is a recognized, ordinary, and necessary treatment process applied to a crude mineral product. Sec. 114 (b) (4) (B). *Cherokee Brick & Tile Co.* v. *United States*, 122 F. Supp. 59 (M. D. Ga., 1954), affd. 218 F. 2d 424 (C. A. 5, 1955). Since petitioner did not and could not perform that process until after the shells were stockpiled on the docks, it did not arrive at its first commercially marketable mineral product until that time, and it therefore follows that the first 50 miles of transportation from the dredge to the plant on the docks where the final process of loading for shipment was performed was the type of transportation contemplated by the statute.[2] The respondent therefore erred in reducing petitioner's gross income from the property by that portion of its gross receipts attributable to hauling the shells up to a distance of 50 miles from the dredge to shore.

The parties stipulated that the distance which petitioner hauled some of the shells from the dredge to its facilities on shore was in

[2] S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), p. 54. See statement offered by the chairman of the Senate Committee on Finance in explanation of the amendment, 96 Cong. Rec. 15,515 (1950).

excess of 50 miles. The statute is mandatory in allowing transportation between the point of extraction and the situs of treatment processes up to 50 miles. An allowance for transportation in excess of 50 miles is permitted only if "the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance * * *." The respondent's Regulations 118, section 39.23(m)–1, provide that a taxpayer who desires to include a distance greater than 50 miles in the computation of his gross income shall file an application with the respondent prior to the filing of his return. The petitioner here did not show that it made such application, nor did it show that "the physical and other requirements" were such that it had to haul the shells a distance in excess of 50 miles from the dredge to its stockpiling site on shore. Since it failed to make that showing, it is not entitled to include in its total gross receipts, for depletion purposes, that portion of its gross receipts attributable to transporting the shells a distance greater than 50 miles. The parties should be able to make the necessary computation of such excludible amount of gross receipts under a Rule 50 recomputation.

We recognize that our holding here conflicts with our prior holding in *American Gilsonite Co.*, 28 T. C. 194 (1957), on appeal (C. A. 10). In that case we found that the taxpayer's first commercially marketable mineral product was gilsonite when sacked in 100-pound paper sacks at a railhead 113 miles from the plant where other processes were applied. We said that none of the gross receipts attributable to hauling the mineral product any of the 113-mile distance was includible in total gross receipts for depletion purposes because the taxpayer did not show that it had made the required application to the Commissioner for allowance of the entire 113-mile haul, nor did it show that the Secretary had found that the physical and other requirements were such that it had to haul the product such distance. We reached our conclusion because we thought the intent of the statute was that if a taxpayer hauled his mineral product a distance of more than 50 miles, he had to apply to the Commissioner for all of such distance or be allowed nothing.

We have reexamined the legislative history of the 1950 amendment and now conclude that Congress meant to allow transportation up to the first 50 miles regardless of how far away the processing plant might be. The chairman of the Senate Committee on Finance offered the following explanatory statement during the debate, 96 Cong. Rec. 15,515 (1950):

If the plants where the ordinary treatment processes are applied are not more than 50 miles from the mine, the entire transportation would be within the rule. If any plant is located at a greater distance, only the transportation to a point not more than 50 miles from the mine would be included within the rule, unless the Secretary, under the authority granted him, should find a greater distance allowable.

We shall therefore no longer follow our holding in *American Gilsonite Co.*, *supra*, on this issue.

The next issue is whether petitioner possessed an economic interest in the shell which it mined under the contract with Southern so that it could claim percentage depletion deductions on the income received from Southern during the years in issue.

This issue of whether a mining contractor has an economic interest in the mineral which he mines for another has been raised in this Court and in the Courts of Appeals on a number of occasions. Most often the cases have involved either strip coal miners who claimed depletion deductions on the income which they received from a coal company, or the coal company itself which objected to the Commissioner's reduction of its gross income from mining by the amounts paid to strip miners who, the Commissioner contended, had an economic interest in the coal which they mined. The Supreme Court has also considered similar cases—most often concerned with economic interests in oil or gas. Out of the many cases decided by the courts has come the requirement, recently stated by the Supreme Court in *Commissioner* v. *Southwest Expl. Co.*, 350 U. S. 308, 314 (1956), that for a taxpayer to take a deduction for depletion, based upon his claimed economic interest in the mineral, he must show that he has "(1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of the oil, to which he must look for a return of his capital.'" Applying that test to the case here means that the petitioner must show that it acquired by investment an interest in the oyster shells which it mined for Southern and that it looked to a severance and sale of the oyster shells to recover that investment. Petitioner has failed to demonstrate that it met the required test, and hence that it possessed an economic interest.

The parties here have tried to liken this case to cases involving strip coal miners in which we or the Courts of Appeals have held that the miners did or did not possess an economic interest in the coal which they mined, as the case might be. Petitioner has relied particularly on *Commissioner* v. *Hamill Coal Corp.*, 239 F. 2d 347 (C. A. 4, 1956), reversing T. C. Memo. 1955-68; and *Weirton Ice & Coal Sup. Co.* v. *Commissioner*, 231 F. 2d 531 (C. A. 4, 1956), reversing 24 T. C. 374 (1955). The respondent, on the other hand, has relied principally on *Usibelli* v. *Commissioner*, 229 F. 2d 539 (C. A. 9, 1955), affirming T. C. Memo. 1954-84; and *Morrisdale Coal Mining Co.*, 19 T. C. 208 (1952). Some facts closely similar to the ones here are present in all of those cases. We agree with the respondent, however, that the case most nearly in point is *Usibelli* v. *Commissioner*, *supra*, and we further agree that the result reached there is the one which should be reached here.

In that case the taxpayer, an independent contractor, obtained a contract from the United States Army to mine and deliver coal to the

Army for its use. The contract provided for a minimum amount of coal to be delivered each month and for a fixed price which the taxpayer was to receive. The contract was for 1 year's duration, but it could be terminated by the Army at any time, or the minimum amount of coal to be delivered could be reduced if the Army wished. We concluded that the taxpayer there was merely employed on a yearly basis to mine and load coal for the Army's use. The coal was never sold and the taxpayer was paid a fixed, agreed-upon sum for the work which he performed. The record did not show that the amounts which he received depended in any way upon the sale or market price of the coal. The Court of Appeals affirmed our holding and, in doing so, reiterated that prime among the tests to determine whether an independent contractor has an economic interest in the mineral which he mines is whether he looks to the severance and sale of the mineral for a recovery of his capital investment, or whether his income is wholly dependent upon the personal covenant of those with whom he contracted.

In this case, as was true in *Usibelli* v. *Commissioner, supra*, petitioner's income, under its contract with Southern, was in no way related to or dependent on a sale of oyster shells, or the market price thereof. The record here does not show, in fact, what use Southern made of the shells. Petitioner's contract was for a period of 1 year, but could be terminated altogether if Southern did not wish any more shells delivered. We conclude that the petitioner did not possess an economic interest in the shells which it mined for Southern, and it was therefore not entitled to claim any percentage depletion deduction on the income which it received from Southern.

It seems to us that petitioner here stood in substantially the same position as an individual coal miner, for example, or a railroad which might transport the coal under an exclusive contract. Both derive a clear economic advantage from mining, but they do not possess the economic interest contemplated by the statute, since they rely solely on the covenant of the person with whom they contracted for their compensation, and do not look directly to a sale of the coal.

Admittedly, to paraphrase Mr. Justice Frankfurter,[3] the many cases dealing with this question have drawn gossamer distinctions, which can hardly be remembered for longer than it takes to state them, between those who do and those who do not possess an economic interest in the mineral product. In both *Commissioner* v. *Hamill Coal Corp., supra*, and *Weirton Ice & Coal Sup. Co.* v. *Commissioner, supra*, relied on by petitioner, we found no economic interest in the strip miners. However, the Court of Appeals for the Fourth Circuit disagreed. In the former case they said the strip miner had made a substantial investment in equipment, that his compensation

---

[3] Dissenting opinion, *Burton-Sutton Oil Co.* v. *Commissioner,* 328 U. S. 25 (1946).

29 T. C.

of a fixed amount per ton was dependent upon market conditions; and that the coal company was obligated to give preference to his coal in making sales. In the latter case they said the strip miner looked to the profits of its mining operations to recover its investment, under a contract which gave it the exclusive privilege of mining the coal to exhaustion for a fixed price per ton. But petitioner here cannot point to similar facts to show an economic interest, even if we were in agreement with the Court of Appeals in those cases. Petitioner's compensation was not dependent on market conditions; it did not look to a sale of the shells for its compensation; and it did not have the exclusive right to mine to exhaustion.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, concurring: The parties, at the request of Judge Rice, stipulated the distances which the shells were transported in the Matagorda Bay operation from the site of the dredge to the stockpiling and loading facilities on shore. Both parties were aware that the stipulation was requested because of the provision of section 114 (b) (4) (B), referred to in the Opinion, relating to transportation to a processing plant and the requirements of the statute if that distance was in excess of 50 miles. Neither desired to introduce any additional evidence.

The evidence does not show why shells were ever transported more than 50 miles or that there were physical or other requirements necessitating transportation of the shells in excess of 50 miles, as might satisfy the requirements of section 114 (b) (4) (B). Neither does the evidence show why extraction would involve transporting the shells to 9 different shore points shown by the stipulation.

BRUCE, FISHER, and TRAIN, *JJ.*, agree with this concurring opinion.