AYERS MATERIALS COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 827–73. Filed July 31, 1974.

*Charles Kohlmeyer, Jr.*, and *William Stein, Jr.*, for the petitioner.
*W. B. Riley* and *Bruce A. McArdle*, for the respondent.

STERRETT, *Judge:* With respect to his audit of petitioner's Federal income tax return for the fiscal year ended May 31, 1968, respondent made the following adjustments: (1) Petitioner's depletion deduction for that year should be reduced by $40,729.39, thereby increasing the stated tax liability by $20,362.01, and (2) a prior refund of the 1968 tax paid in the amount of $32,310.11 by reason of the application of a net operating loss carryback from the fiscal year ended May 31, 1971, had been erroneously paid. Based on these adjustments respondent determined a total deficiency in the amount of $52,672.12. The central issue for our resolution is the proper determination of petitioner's gross income from property under section 613(c) of the Internal Revenue Code of 1954 [1] for purposes of computing its percentage depletion for the 1968 fiscal year.

### FINDINGS OF FACT

Concurrently with their joint motion to submit the case under Rule 122, the parties filed a stipulation of facts with attached exhibits which are incorporated herein by this reference.

Ayers Materials Co., Inc. (hereinafter petitioner), is a corporation organized under the laws of the State of Louisiana with its principal offices in Harvey, La. Petitioner's Federal income tax return for its taxable year ended May 31, 1968, was filed with the district director of internal revenue in New Orleans, La.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

During the year in question, petitioner was engaged in the business of dredging and selling clamshells from the bed of Lake Pontchartrain under a permit from the State of Louisiana for which petitioner paid a royalty to the State. The clamshells were mined by suction-dredging from the bed of the lake and then washed and passed over screens on the dredges to remove silt and mud. After screening the shells were sluiced through loading chutes onto barges. One or more tugs continuously stood by the dredges in order to shift barges to and from the dredges so that a continuous dredging operation could be maintained. At the dredging site the only storage facilities available for the shells being dredged were on the barges which petitioner owned or chartered. The barges loaded with shells were transported to customers' places of business or jobsites, or alternatively, to petitioner's storage yards. Those shells delivered to petitioner's yards were stockpiled and, when subsequently sold, were loaded by crane to trucks, railcars, or other barges provided by the customer for delivery.

Petitioner sold shells delivered directly from the dredging operation to customers on a delivered basis, while shells sold from the storage yards were sold f.o.b. yard. The shells sold at petitioner's yards, during the fiscal year ended May 31, 1968, were sold at an average price of $2.21 per cubic yard. During that year petitioner sold 1,154,623 cubic yards of clamshells, of which approximately 36.5 percent was delivered to customers from stockpiles at the storage yards and the remaining 63.5 percent was delivered directly to customers from the dredging site. Since there is no indication from the record to the contrary, we find that the shells sold at the dredge were of identical quality as those sold at the yards. Petitioner maintained inventories of shells at five yards, all located in the State of Louisiana. The distance between the five yards and the furthermost point where petitioner carried on dredging operations ranged from 36.1 to 48.3 miles.

The allowance for depletion set forth on its Federal income tax return for the fiscal year ended May 31, 1968, amounting to $67,784.15, was computed by petitioner in accordance with the method petitioner and respondent mutually accepted as a basis for closing the audit of petitioner's returns for its fiscal years ended May 31, 1961, through May 31, 1965.

OPINION

The central issue for our resolution is whether the activities which took place at petitioner's storage yards are to be considered as mining for the purpose of computing petitioner's percentage depletion deduction for its 1968 fiscal year. A brief exposition of the statutory framework will set the background of the issue.

Section 611(a) provides generally that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion. Under section 613(a) a reasonable allowance is designated as a percentage, specified in subsection (b) for each mineral and ore, of the gross income from the property. Such an allowance, however, is subject to a ceiling equal to 50 percent of the taxable income from the property computed without regard to the allowance. The parties are in agreement that petitioner is entitled under subsection (b) to a 5-percent depletion rate.

In the case of property other than oil or gas wells, gross income from property is defined in section 613(c)(1) as gross income from mining. In turn mining is defined in section 613(c)(2) as follows: "The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals * * * from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles."

Section 613(c)(4) lists the treatment processes which are considered as mining for certain specific minerals and ores, of which clamshells are not one, and for two broad categories of minerals not otherwise named: minerals customarily sold in the form of a crude mineral product and minerals not customarily sold in that form. It is arguable that almost no mineral falls within the former category since nearly all mined minerals have some surface processes applied to them as a matter of course before sale. But such a strict interpretation is not warranted in light of the regulations. According to section 1.613–3(f)(3)(iv), Income Tax Regs.,[2] an ore or mineral is customarily sold in the form of a crude mineral product if a significant portion of the production is sold or used in a nonmining process prior to the alteration of its inherent mineral content. Since petitioner's clamshells were only washed and screened prior to sale, we hold that they were customarily sold in the form of a crude mineral product.

Therefore, the depletion of clamshells is governed by subparagraph (C) of paragraph (4): "(4) Treatment processes considered as mining.—The following treatment processes * * * shall be considered as mining * * * (C) in the case of * * * minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, sintering, and substantially equivalent processes to

[2] All regulatory references are as they were enumerated after amendment by T.D. 6965, July 26, 1968, 33 Fed. Reg. 10692, which had been proposed on July 13, 1966, 31 Fed. Reg. 9506.

bring to shipping grade and form, and loading for shipment." The statute provides that mining shall encompass those named processes, processes substantially equivalent to the named processes, and processes which are necessary or incidental to the named processes. Sec. 613(c)(2).

Since the washing and screening which took place at petitioner's dredges were necessary to bring the clamshells to shipping grade and form, we think they were substantially equivalent to sorting and concentrating within the meaning of the statute. Sec. 1.613-3(f)(3)(i), Income Tax Regs. Consequently we hold that they were mining processes.

The critical inquiry before us is whether the loading of clamshells onto trucks, railcars, or barges at petitioner's storage yards for delivery to customers is encompassed within the term "loading for shipment" under section 613(c)(4)(C). The respondent contends that it is not and we agree, although not precisely for the same reasons that he urges. Respondent asserts that petitioner's activities beyond the dredge were not "ordinary treatment processes" because all petitioner's clamshells were commercially marketable at the dredge. His argument is based on the depletion statute as it existed prior to 1961, as interpreted by the Supreme Court in *United States* v. *Cannelton Sewer Pipe Co.*, 364 U.S. 76 (1960). As explained below we think respondent's argument is anachronistic and, in fact, we find it hard to understand why he insists on using the word "ordinary" in connection with "treatment processes" when the word has been absent from the statute since 1961.

Section 613(c), prior to being amended in 1960, defined mining to include not only the extraction of ores or minerals from the ground, "but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the *commercially marketable* mineral product or products." (Emphasis added.) In explicating "commercially marketable," the Supreme Court in *Cannelton* held that the proper cutoff point for calculating the depletion allowance is where the mineral first becomes "ready for industrial use or consumption." *United States* v. *Cannelton Sewer Pipe Co., supra* at 86. In applying the facts of that case to the law, the Court determined that the substantial sales of raw product in the taxpayer's vicinity demonstrated that the raw product was in a state ready for industrial use or consumption, and thus it had passed the mining stage.

In 1960 Congress altered the definition of mining by passing the Public Debt and Tax Rate Extension Act of 1960, Pub. L. 86-564, 86th Cong., 2d Sess. (hereinafter the Gore amendment). The Gore amendment eliminated from section 613(c) the litigious language before the Court in *Cannelton:* "commercially marketable mineral

product." In addition, the amendment altered the statutory framework of section 613(c) and eliminated the modifying word "ordinary" preceding "treatment processes." Rather than be concerned about marketability, Congress attempted to draw a specific line in the new legislation between mining and manufacturing by listing the processes it thought to be part of normal mining operations. It is the statute, as amended in 1960, which we must construe in this controversy.

Approximately 36.5 percent of petitioner's mining production was screened and washed at the dredges, loaded onto barges, and transported to shore. On shore these shells (hereinafter yard shells) were stockpiled at one of five storage yards and later reloaded onto trucks, railcars, or other barges for delivery to customers. The fact that stockpiling, a nonmining process, was interposed between the loading at the dredges and the loading at the yards supports our belief that only the former was intended to be encompassed within the statutory words "loading for shipment." To hold otherwise would enable the petitioner to compute percentage depletion on the yard shells after their value had been enhanced by two loadings.

As a matter of statutory construction, we conclude that loading for shipment, to qualify as a treatment process under section 613(c)(4)(C), should immediately follow the sorting, concentrating, sintering, and substantially equivalent processes which are applied to bring a crude mineral to shipping grade and form.

Petitioner relies primarily on *Matagorda Shell Co.* v. *Commissioner*, 29 T.C. 1060 (1958), in support of its contention that the loading for shipment at the storage yards was a mining process. However, we think *Matagorda* is factually distinguishable from the case at hand. The oystershells mined in *Matagorda* were washed and screened at the dredges, then transported to shore where they were stockpiled, dried, and subsequently loaded for shipment to customers. In contrast to petitioner's mining operation, the oystershells in *Matagorda* were not in shipping grade and form until after they had been dried on shore as required by some of their purchasers. The important distinction we think is that there was not in *Matagorda* a hiatus between the shells being prepared for shipment and the loading for shipment that took place at the shore installations. Petitioner's clamshells, on the other hand, were in shipping grade and form at the dredges. The loading at the dredges for transfer to the storage yards, which occurred after petitioner's clamshells had attained shipping grade and form, we think, is the loading for shipment that Congress was referring to in section 613(c)(4)(C).

Since we conclude that the loading for shipment at petitioner's storage yards cannot fairly be included as a treatment process under section 613(c)(4)(C), the dredge-to-shore transportation is not en-

compassed within the statutory definition of mining. Sec. 613(c)(2).

Although respondent's deficiency was computed in accordance with the proportionate profits method outlined in section 1.613-3(d), Income Tax Regs., he conceded in his brief that petitioner's gross income from mining should be computed by using a representative market price. The rationale behind a representative price is to ascertain gross income from mining by using a dollar figure which most nearly represents the approximate price at which the petitioner, in light of market conditions, could have sold its shells, if prior to the application of nonmining processes, it had sold those shells to which it applied nonmining processes. Sec. 1.613-3(c)(1), Income Tax Regs.

Both parties agree that the clamshells which petitioner sold directly from the dredges (hereinafter dredge shells) were sold after the application of only mining processes but after nonmining transportation. Therefore, in ascertaining a representative market price for the dredge shells, section 1.613-3(e)(2)(i) of the regulations is expressly applicable. The representative market price for the dredge shells is their delivered price reduced by costs paid for "purchased transportation" as defined in section 1.613-3(e)(2)(iii), Income Tax Regs.

The final question is whether the representative market price determined for the dredge shells under section 1.613-3(e)(2), Income Tax Regs., is also representative for the yard shells. In determining the representative market price for a mineral, consideration should be given only to prices of minerals of like kind and grade. Sec. 1.613-3 (c)(3), Income Tax Regs. Since we found as a fact that the dredge shells were of identical quality as the yard shells, we think the representative market price for the dredge shells must also be the representative market price for the yard shells.

Finally, in computing gross income from the property, royalties which the petitioner paid to the State of Louisiana are excluded. Sec. 1.613-2(c)(5)(i), Income Tax Regs.

*Decision will be entered under Rule 155.*