THE CARBORUNDUM COMPANY, A DELAWARE CORPORATION,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7289–74, 2338–75, 2339–75.    Filed April 26, 1978.

*Walter A. Slowinski, Dennis I. Meyer,* and *Ivan Shandor,* for the petitioner.
*James Silhasek, Sommers T. Brown,* and *James F. Perna,* for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency | Year | Deficiency |
|------|------------|------|------------|
| 1963 | $39,250.00 | 1966 | $57,861.10 |
| 1964 | 43,986.00 | 1967 | 57,350.31 |
| 1965 | 42,753.00 | 1968 | 54,991.38 |

Various issues have been settled and one issue has been severed for independent briefing and opinion. The only issue currently presented for our decision is what steps in processing the mineral "Seneca Standard" tripoli are mining processes for purposes of calculating petitioner's allowable depletion deduction under section 611.[2]

---

[1] By order of this Court dated Feb. 2, 1976, the three docketed cases involving the same petitioner were consolidated for trial, briefing, and opinion.

[2] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in question.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, the Carborundum Co., is a Delaware corporation with its principal offices in Niagara Falls, N. Y. Petitioner timely filed consolidated Féderal income tax returns for the years in question with the District Director of Internal Revenue, Buffalo, N. Y.

Carborundum is engaged directly and through subsidiaries in the manufacture and sale of a diversified line of products that includes abrasive materials. One such mineral, "Seneca Standard" tripoli, is extracted from deposits near Seneca, Mo. "Seneca Standard" tripoli is a form of silica that varies from 90 to 98 percent silicon dioxide ($SiO_2$), and contains fractional percentages of iron, alumina, and quartz. One outstanding characteristic of "Seneca Standard" that distinguishes it from other forms of tripoli such as rotten-stone and amorphous silica, is the physical structure of the individual particle. It is soft, porous, has a fiber structure with no sharp edges, and an average size of less than 0.01 millimeters. Even the most minute particle never has a sharp or jagged edge. "Seneca Standard" also has a high absorption rate. The crude stone can absorb up to 35 percent water and the powdered material can absorb up to 52 percent water. The absorption of oil varies from 40 to 52 percent, depending on the fineness of the material.

The major use of "Seneca Standard" tripoli is in buffing compounds. Because of its physical properties, "Seneca Standard" may be bound firmly by stearic acid, tallow, paraffin, petrolatum, and oils, with which it is mixed in various formulas. When used in a buffing compound, the particles break down at the proper rate as pressure is applied and give maximum buffing results with a minimum of resistance.

Deposits of "Seneca Standard" are discovered through core drilling. After a deposit is discovered, the overburden, ranging from 8 to 15 feet in depth, is stripped from the mineral deposit. The surface of the exposed mineral is then cleaned to prevent contamination by earth or clay. Next, holes are drilled into the mineral, they are chambered with dynamite, and shot with black powder. The broken material, containing 20 to 35 percent moisture, is loaded onto trucks and taken to open-air drying sheds for curing. These drying sheds are "pole barn" structures,

having roofs, but no siding. These structures allow the prevailing winds to draw moisture from the exposed mineral. During the outdoor drying process, which might last from 6 to 12 months, the moisture content of "Seneca Standard" tripoli is reduced from approximately 35 percent to as low as 10 percent.

After the "Seneca Standard" is cured through air drying, the mineral is trucked to petitioner's processing mill for further treatment. The first step in processing occurs when the crude mineral is dumped through a grate into a jaw crusher for primary crushing. The material leaving the jaw crusher has a particle size no larger than one and a half inches. The crushed material is then fed by bucket elevator into one of four holding tanks. Next, the crude "Seneca Standard" is fed from the holding tanks into an 80-foot indirect fired rotary dryer. This dryer, with a temperature of approximately 2,800 to 3,000 degrees Fahrenheit, reduces the moisture content of "Seneca Standard" tripoli to approximately 1 percent. There is no change in chemical composition or physical properties other than the extraction of moisture as a result of drying. From the dryer, the ore drops into a secondary crushing unit, referred to as the hammer mill. In the hammer mill "Seneca Standard" tripoli is reduced in particle size to no larger than one-quarter inch. Following crushing in the hammer mill, the material is taken by bucket elevator to a tube mill. The tube mill, a fine grinding unit, is lined with large adamant silica stone and contains smaller tumbling adamant silica stones that act as grinding media. The parties have stipulated that the process "Seneca Standard" tripoli is subjected to in the tube mill is "fine pulverization" as that term is defined in section 1.613–4(g)(6)(v), Income Tax Regs. The tube mill is the final stage of grinding.

From the tube mill, the fine pulverized "Seneca Standard" tripoli is separated into three different grades of powdered material. The three different grades are referred to as once ground, double ground, and air floated. Separation occurs by passing the two finer grades—the air floated and double ground—through Raymond air separators. Once ground, the coarsest grade produced is classified by using a Tyler Hummer screen. After separating the particles of "Seneca Standard" tripoli according to size by passing the material through classification screens, the "Seneca Standard" is then fed into a packing machine where it is packed into large four- or five-ply

paper bags which, when filled, weigh 101 pounds. These bags are then sealed, stenciled with identification symbols, stacked on wooden or cardboard pallets, and then loaded into railroad cars for shipment.

Processing "Seneca Standard" tripoli is a closed-circuit operation from the time the mineral is fed into the jaw crusher until it is packed into paper bags. Throughout this process nothing is added to the material and there is no change in composition or physical properties, other than the removal of all but approximately 1 percent of the moisture content.

Petitioner controls 98 percent of the domestic and foreign market of "Seneca Standard" tripoli. Consequently, there are no representative field prices for the mineral in any condition other than the finished product shipped in paper bags. Although large blocks of "Seneca Standard" were used in water filtration during the late 1800's and early 1900's, since 1920 there has been no market for "Seneca Standard" in block form.

Respondent, in his notice of deficiency, allowed certain processes to qualify as mining processes for the purpose of determining petitioner's depletion allowance. Those processes considered by respondent as mining processes are: stripping the overburden, blasting, loading the rough material onto trucks, hauling to open-air drying sheds and drying, crushing in the jaw crusher, drying in the gas-fired rotary furnace, grinding in the hammer mill, and loading the sacks into boxcars. Those processes respondent considered manufacturing processes, not mining processes, are fine pulverization in the tube mill, separating and classifying into grades of fineness, and sacking (including labor costs in mechanically filling the bags). Respondent also determined that the cost of miscellaneous supplies (including the cost of pallets and the cost of paper for lining railroad cars), and the cost of the paper bags were attributable to nonmining processes.

## OPINION

For purposes of calculating petitioner's allowable depletion, we must determine which processes in extracting and treating "Seneca Standard" tripoli are mining processes.

Petitioner contends all steps in extracting and processing "Seneca Standard" tripoli—from removing the overburden to loading the sacks of processed tripoli onto boxcars—are mining processes. Respondent contends that the mining process starts

with removing the overburden and effectively ends when the "Seneca Standard" tripoli leaves the hammer mill after grinding. Respondent has conceded, however, that loading boxcars for shipment also constitutes a mining process. To resolve the parties' differences we must decide whether any of the processes following grinding in the hammer mill, and preceding loading the boxcars, constitute mining processes.

Generally, section 611 allows as a deduction in computing taxable income, a "reasonable allowance for depletion." In the case of natural deposits, including tripoli, the allowance for depletion is a specified percentage of "gross income from the property," with a maximum depletion allowance of 50 percent of the taxpayer's taxable income from the property. Sec. 613.

Section 613(c)(1) defines the term "gross income from the property" as the gross income from "mining," which includes "not merely the extraction of the ores or minerals from the ground but also the *treatment processes considered as mining* described in [sec. 613(c)(4)] (and the treatment processes necessary or incidental thereto)." (Sec. 613(c)(2); emphasis added.) In describing treatment processes considered as mining, section 613(c)(4)(C) and (D) distinguishes between ores or minerals customarily sold in the form of crude minerals and those not customarily sold in the form of crude minerals. In the former case, treatment processes considered mining processes are those necessary to bring the mineral to "shipping grade and form, and loading for shipment." In the latter case, additional processes are considered mining processes including "crushing, grinding, and beneficiation by concentration * * * or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit." In contrast to section 613(c)(4), section 613(c)(5) specifically lists processes not considered as mining. Included in this list, unless otherwise provided for in section 613(c)(4) (or necessary or incidental to processes so provided for), is fine pulverization.

With this basic statutory framework in mind, the parties' arguments may be placed in focus. Petitioner contends "Seneca Standard" is not customarily sold in the form of a crude mineral, and fine pulverization in the tube mill, separation and classification, bagging, and sacking are substantially equivalent to those

processes listed in section 613(c)(4)(D). If, however, "Seneca Standard" tripoli is classified as a mineral customarily sold in the form of the crude mineral, petitioner contends the processes disallowed by respondent are mining processes under section 613(c)(4)(C) since they are "necessary or incidental" to the mining processes listed in section 613(c)(4)(C). Finally, should we conclude, in spite of petitioner's arguments, that the processes are nonmining processes, petitioner argues that sacking, bagging, and supply costs should be allocated to both mining and nonmining procedures in applying the proportionate profits method of determining gross income from mining.

Respondent, expectedly, contends all the disallowed processes are nonmining processes. He further contends that in determining petitioner's allowance for depletion under the proprotionate profits method, the costs of sacking, bagging, and supplies are nonmining costs.

As the initial point in our analysis we note that section 613(c)(5) specifically considers fine pulverization (the process occurring in petitioner's tube mill) a nonmining process, unless provided otherwise by section 613(c)(4). Petitioner therefore has the burden of showing that its fine pulverization process fits within the exception of section 613(c)(5).[3]

In an attempt to show that its pulverization process is a mining process under section 613(c)(4), petitioner relies on this Court's opinion in *International Talc Co. v. Commissioner*, 15 T.C. 981 (1950). In *International Talc*, we concluded that mining processes of talc included all processes occurring prior to the "first commercially marketable form" of the mineral. *International Talc Co. v. Commissioner, supra* at 988. This included crushing, grinding, grating, and sacking. Petitioner's reliance upon *International Talc* is, however, misplaced. First, *International Talc* was decided under the pre–1960 "commercially marketable mineral product" test, a test no longer valid.[4]

---

[3]Should petitioner prevail in showing that its fine pulverization process is a mining process, it may take advantage of sec. 1.613–4(f)(5)(ii), Income Tax Regs., which provides that size classification processes applied to the products of an allowable mining process are also mining processes.

[4]Prior to its amendment in 1960, sec. 613(c) defined mining to include "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the *commercially marketable mineral product*." (Emphasis added.) The Gore Amendment, sec. 302(b)(2), Pub. L. 86–564, 86th Cong., 2d Sess. (1960), removed the emphasized language and created the current statutory framework of sec. 613(c). We noted the purpose of the Gore Amendment in *Ayers Materials Co. v. Commissioner*, 62 T.C. 557, 561 (1974):

Second, when Congress rejected the "commercially marketable mineral product" test, it created an exception for the pulverization of talc, effectively codifying the holding, if not the rationale, of *International Talc*. Section 613(c)(4)(E) now expressly provides that mining processes shall include "the pulverization of *talc*." (Emphasis added.) Congress has not, however, been willing to expand the exception of section 613(c)(4)(E) to the mineral tripoli. On at least *four* occasions, Congress has refused to modify section 613(a)(4)(E) to include the pulverization of tripoli. See H. R. 8672, 88th Cong., 1st Sess. (1963); H.R. 11337, 88th Cong., 2d Sess. (1964); H.R. 784, 89th Cong., 1st Sess. (1965); H.R. 12361, 89th Cong., 2d Sess. (1966).

In light of the general rule provided by section 613(c)(5) that pulverization is a nonmining process, and Congress' refusal to extend the pulverization exception in section 613(c)(4)(E) to tripoli, we must carefully examine petitioner's contentions that fine pulverization of "Seneca Standard" tripoli is, nevertheless, a mining process, or necessary or incidental thereto under either section 613(c)(4)(C) or section 613(c)(4)(D).

Petitioner first argues that "Seneca Standard" tripoli is a mineral not customarily sold in the form of the crude mineral. Should we accept this argument, petitioner contends that pulverization, screening, and bagging are processes, or a combination of processes, substantially equivalent to those named in section 613(c)(4)(D). We disagree, however, with petitioner's argument that "Seneca Standard" tripoli is a mineral not customarily sold in the form of a crude mineral.

"Seneca Standard" tripoli is a mineral generically different from those listed in section 613(c)(4)(D).[5] As found and mined, "Seneca Standard" tripoli ranges in purity from 90 to 98 percent. The parties have stipulated that after primary crushing nothing is added to the material and there is no change in its chemical

---

"Rather than be concerned about *marketability*, Congress attempted to draw a specific line in the new legislation between mining and manufacturing *by listing* the processes it thought to be part of normal mining operations. [Emphasis added.]"

[5] Sec. 613(c)(4)(D) lists treatment processes considered mining: "in the case of lead, zinc, copper, gold, silver, uranium, or fluorspar ores, potash, and ores or minerals which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore or the mineral or minerals from other material from the mine or other natural deposit."

composition; at the conclusion of the ordinary treatment up through fine pulverization and separation, there is no change in the chemical composition of the mineral; and during the entire operation, no material is removed for additional treatment and nothing is added. In contrast, the ores listed in section 613(c)(4)(D) all require various forms of treatment to raise the level of purity of the mined mineral. None of the ores listed are found in any appreciable quantities in a pure form. In *Barton Mines Corp. v. Commissioner*, 446 F.2d 981, 996 (2d Cir. 1971),[6] the court explained Congress's amendment of section 613(c)(4)(D) in 1960: "The structure of the amendment makes it clear that Congress intended the Gore Amendment to be a specific designation of those processes that would be considered as mining. Congress intended that processes *which either removed or aided in the removal of impurities* would be classified as mining." (Emphasis added.) As stipulated by the parties there is no change in chemical composition of "Seneca Standard" tripoli during its treatment by petitioner, and no material is added or removed during the closed process. Because no impurities are removed prior to sale, we conclude that "Seneca Standard" tripoli is a mineral customarily sold in the form of a crude mineral product.[7]

We find support for our conclusion in section 1.613–4(f)(3)(iv), Income Tax Regs., which states:

> An ore or mineral is "customarily sold in the form of a crude mineral product", within the meaning of section 613(c)(4)(C), if a significant portion of the production thereof is sold or used in a nonmining process prior to the alteration of its inherent mineral content by some form of beneficiation, concentration, or ore dressing. An ore or mineral does not lose its classification as a crude mineral product by reason of the fact that, before sale or use in a nonmining process, the ore or mineral may be crushed or subjected to other processes which do not alter its inherent mineral content. Whether the portion of production sold or used in the form of a crude mineral product is a significant portion of the total production of an ore or mineral is a question of fact.

---

[6]The Court of Appeals decision by the Second Circuit reversed *Barton Mines Corp. v. Commissioner*, 53 T.C. 241 (1969). Since the case before us will be appealable to the Second Circuit, we will follow the law as articulated by the Court of Appeals. See *Golsen v. Commissioner*, 54 T.C. 742, 756–757 (1970).

[7]Compare *Barton Mines v. Commissioner, supra*, in which the taxpayer through beneficiation by concentration (a mining process specifically enumerated in sec. 613(c)(4)(D)), raised the level of purity of its mined product from 8 percent to 98 percent. We have no similar removal of substantial amounts of impurities since, as the parties agree, "Seneca Standard" tripoli is commonly found in a 90- to 98-percent pure form and during petitioner's treatment processes no material is added or removed. Further, there is no similar concentration process of "Seneca Standard" tripoli.

Since there is no alteration of the inherent mineral content of "Seneca Standard" tripoli prior to its sale by petitioner to customers, we conclude that "Seneca Standard" tripoli is sold in the form of a crude mineral product. Consequently, petitioner is only allowed to treat as mining "sorting, concentrating, sintering, and substantially equivalent processes to bring to shipping grade and form, and loading for shipment." Sec. 613(c)(4)(C).

The phrase "to bring to shipping grade and form" is defined by section 1.613–4(f)(3)(iii), Income Tax Regs., as bringing a mineral to the stage "at which the ore or mineral is shipped to customers or used in nonmining processes * * * by the taxpayer." Since "Seneca Standard" tripoli is not shipped to customers prior to bagging, we must determine whether petitioner uses the ore in a nonmining process prior to its sale to customers.

Section 1.613–4(g)(1), Income Tax Regs., interpreting section 613(c)(5), lists fine pulverization as a nonmining process. Separating or screening the product of a finely pulverized process (including separation by air or water flotation) is also considered a nonmining process. Sec. 1.613–4(g)(6)(v), Income Tax Regs. Under the Commissioner's regulations, therefore, petitioner uses "Seneca Standard" tripoli in a nonmining process after it leaves the hammer mill. Nevertheless, petitioner contends that fine pulverization is "incidental" to the *prior* drying and grinding processes—admitted mining processes—and therefore, under the parenthetical language of section 613(c)(5), it should be considered a mining process. Petitioner's argument that fine pulverization is incidental to the mining processes of grinding and drying must be rejected.

In *Barton Mines Corp. v. Commissioner*, 446 F.2d 981, 991 (2d Cir. 1971), the United States Court of Appeals for the Second Circuit discussed the term "incidental" and concluded that a process was incidental to a mining process if it occurred "in subordinate conjunction with a mining process, and that it is the coincidental and secondary result of the mining process." Further, the court noted that section 1.613–3(f)(2)(ii), Income Tax Regs., defines the term "incidental" to include any process *related* to a mining process so long as its cost is insubstantial in relation to the cost of the mining process. The court simplified these definitions of "incidental" by concluding that processes were incidental to mining processes if they were "designed to

facilitate the *subsequent"* mining processes. (Emphasis added.) *Barton Mines Corp. v. Commissioner, supra* at 992. Petitioner makes an argument that the cost of fine pulverization is insubstantial to the prior mining costs of crushing, grinding, and drying, and therefore should be considered incidental to mining processes. Although the cost may be insubstantial, petitioner fails to show that pulverization was "designed to facilitate" any subsequent mining process. Indeed, we can find no relation between any of the acknowledged mining processes and the fine pulverization and separation. Consequently, we must conclude that fine pulverization and subsequent separation are not incidental to or related to any mining processes, and are therefore not themselves mining processes.[8]

Even though we conclude that fine pulverization is not incidental to a mining process, petitioner contends that fine pulverization must be a mining process, since "Seneca Standard" tripoli is not in a shipping grade or form when it leaves the hammer mill. As proof that "Seneca Standard" tripoli is not in a shipping grade or form when it leaves the hammer mill, petitioner notes that there is presently no market for "Seneca Standard" tripoli in any form other than once ground, twice ground, and air floated. Simply stated, petitioner contends there is only a market for "Seneca Standard" tripoli when it emerges from petitioner's plant in sealed paper bags. Therefore, any process prior to the final product produced by petitioner must be considered a mining process. We disagree with petitioner's reasoning on this point.

In making its argument petitioner relies on the previously rejected "first commercially marketable mineral product" standard applied in the depletion area prior to the Gore Amendment in 1960. As earlier noted, this standard has been rejected in favor of a more reliable test in which Congress attempted to distinguish between mining and manufacturing processes by listing the processes it thought to be part of normal

---

[8]Apparently only through circular reasoning could we conclude that fine pulverization and separation are mining processes: petitioner contends that fine pulverization is a mining process since it is incidental to, i.e., less expensive than, the preceding drying process. Since size classification follows a process deemed by petitioner to be a mining process, it, too, is considered a mining process under sec. 1.613–4(f)(5)(ii), Income Tax Regs. Since size classification is considered a mining process, the preceding process of fine pulverization which *facilitates* the size classification is therefore a mining process. *In sum, petitioner bootstraps all processes into the categorization of mining processes.*

mining operations. See *Ayers Materials Co. v. Commissioner*, 62 T.C. 557, 561 (1974).[9] Petitioner's observation that "Seneca Standard" tripoli is unmarketable in any form other than once ground, twice ground, and air floated is a self-fulfilling statement. Petitioner has a virtual monopoly over "Seneca Standard" tripoli and chooses to sell it only in these three forms. Since these are the only three forms available to purchasers, these are the forms that are marketable. Essentially, the form of "Seneca Standard" tripoli that is marketable is a circumstance of petitioner's choosing. Cf. *Virginia Greenstone Co. v. United States*, 308 F.2d 669, 670 (4th Cir. 1962); *Solite Corp. v. United States*, 375 F.2d 684, 687 (4th Cir. 1967).

In sum, we must reject petitioner's contentions that fine pulverization is a mining process. In 1960, with the introduction of the Gore Amendment, Congress attempted to simplify this area by naming certain processes that were mining processes and those that were nonmining processes. One of those processes specifically named as a nonmining process was fine pulverization. Although Congress did allow room for exceptions to its general rule, petitioner has not persuasively or adequately shown that it should fall within one of these exceptions.

Since we conclude that fine pulverization is a nonmining process, we also conclude that screening and sorting "Seneca Standard" tripoli into three different grades of fineness is a nonmining process. Section 1.613–4(g)(6)(v), Income Tax Regs., specifically directs that "Separating or screening the product of a fine pulverization process (including separation by air or water flotation) shall be treated as a nonmining process." Since separating "Seneca Standard" tripoli into various degrees of fineness was performed for the benefit of subsequent purchasers and not incidental to a mining process, we conclude that separation was a manufacturing process.

Finally, we must decide whether sacking and bagging are mining processes, and if not, whether sacking, bagging, and related costs should be allocated in part to both mining and nonmining costs in applying the proportionate profits method for determining the gross income from mining.

Petitioner contends sacking and bagging are necessary to

---

[9]See also Conf. Rept. 2005, 86th Cong., 2d Sess. (1960), 1960–2 C.B. 741, 745: "Under the Senate amendment the treatment processes considered as mining *are limited to those specifically listed* in the amendment." (Emphasis added.)

bring "Seneca Standard" tripoli to shipping grade or form, or alternatively, sacking and bagging are necessary and incidental to recognized mining processes. Respondent, in contrast, alleges that sacking and bagging and related costs are neither direct nor indirect mining costs and are attributable only to the manufacturing aspects of petitioner's operation.[10]

Generally, sacking and bagging, and related miscellaneous costs are considered manufacturing or nonmining processes. See section 1.613–4(g)(4), Income Tax Regs., stating, "The production, *packaging*, distribution, and marketing of manufactured products, and the processes necessary or incidental thereto, are nonmining processes." (Emphasis added.) See also *Riddell v. Victorville Lime Rock Co.*, 292 F.2d 427 (9th Cir. 1961) (bagging limestone not included in gross income from mining); *Standard Lime & Cement Co. v. United States*, 329 F.2d 939 (Ct. Cl. 1964) (packaging costs are not mining costs); *United States v. California Portland Cement Co.*, 413 F.2d 161 (9th Cir. 1969) (costs of bags and bagging allocable to nonmining operations).

Section 1.613–3(d)(4)(iii)(*a*), Income Tax Regs., provides that in determining gross income from the property by use of the proportionate profits method, "The costs attributable to containers, bags, packages, pallets, and similar items as well as the costs of materials and labor attributable to bagging, packaging, palletizing, or similar operations shall be considered as nonmining costs." We find no persuasive reason for deviating from this regulation, a regulation that has frequently been followed in the past. See, e.g., *Standard Lime & Cement Co. v. United States*, *supra*; *United States v. California Portland Cement Co.*, *supra*; *Southwestern Portland Cement Co. v. United States*, 435 F.2d 504 (9th Cir. 1970). See also sec. 1.613–4(d)(3)(iii)(*a*), Income Tax

---

[10]Since we have determined that petitioner uses "Seneca Standard" tripoli in nonmining processes before it is sold and since there is no representative field or market price for the mineral before it is used by petitioner in nonmining processes, it is necessary to employ the proportionate profits method to determine petitioner's gross income from mining "Seneca Standard" tripoli. This method employs the following formula:

$$\frac{\text{Mining costs}}{\text{Total costs}} \times \text{Gross sales} = \text{Gross income from mining}$$

It is therefore to petitioner's benefit, in determining its percentage depletion, to increase the numerator in the above formula. Petitioner contends that the sacking, bagging, and related miscellaneous costs are mining costs (thereby increasing the numerator in the above formula), or if we conclude otherwise, then those costs should be allocated proportionately to petitioner's mining processes and to its manufacturing processes. See generally sec. 1.613–4(d)(4), Income Tax Regs.; *Standard Lime & Cement Co. v. United States*, 329 F.2d 939 (Ct. Cl. 1964); *United States v. California Portland Cement Co.*, 413 F.2d 161 (9th Cir. 1969).

Regs. Accordingly, we conclude that petitioner's costs in sacking and bagging and related costs including labor, pallets, and paper for lining boxcars are nonmining costs that must be included only in the denominator of the proportionate profits method formula.

To reflect the foregoing,

*An appropriate order will be issued.*